[No. A051115. First Dist., Div. Four. Mar. 25, 1994.]

GRACE McLAUGHLIN et al., Plaintiffs and Respondents, v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PA., Defendant and Appellant.

**COUNSEL**

Pettit & Martin, D. Wayne Jeffries, Saul D. Bercovitch, Robinson & Wood, Archie S. Robinson, Thomas R. Fellows, Stroock & Stroock & Lavan, Michael F. Perlis, Horvitz & Levy, Ellis J. Horvitz, Peter Abrahams and Stephen E. Norris for Defendent and Appellant.

Cotchett, Illston & Pitre, Joseph W. Cotchett, Susan Illston, Marie Seth Weiner, Morgan, Ruby, Schofield, Franich & Fredkin, Allen J. Ruby, Lexie D. Schroeder, Crosby, Heafey, Roach & May, Ronald L. Murov, Howard A. Janssen, Thomas T. Anderson and Samuel Trussell for Plaintiffs and Respondents.

**OPINION**

**ANDERSON, P. J.**—This is an appeal from a multimillion dollar judgment in a bad faith action brought by 13 investors in Technical Equities Corporation (Technical Equities) against the company's primary insurance carrier, National Union Fire Insurance Company of Pittsburgh, Pa. (National Union). Technical Equities, a diversified investment services company, financially collapsed in February 1986. Finding their investments substantially worthless after the company's demise, hundreds of investors successfully sued the officers and directors of Technical Equities for fraud, negligent misrepresentation, breach of fiduciary duty and negligence.

National Union insured Technical Equities under a directors and officers liability policy (D & O policy) as well as a comprehensive general liability policy (CGL policy). From the inception of the investor litigation, National Union took the position that (1) there was coverage only for the second year of the three-year D & O Policy, and (2) the policy itself was a wasting asset so that defense costs were included within the annual policy limits. Certain plaintiff investors filed a test case for declaratory relief to challenge this interpretation. Similarly, a second declaratory relief action was brought to resolve whether there was coverage under the CGL policy for their damages stemming from the wrongful acts of Technical Equities and its officers and directors.

The trial court entered declaratory judgments favoring broad coverage under both policies; these judgments paved the way for resounding victories by respondents[1] on five causes of action in this bad faith suit. Meanwhile, National Union appealed both declaratory judgments. In *Chatton* v. *National Union Fire Ins. Co.*[2] and *Helfand* v. *National Union Fire Ins. Co.*[3] we, respectively, overturned and substantially overturned these judgments. Now comes National Union a third time asking us to overturn the massive judgments handed down in the face of erroneous instructions concerning coverage under the policies.

---

[1]Respondents herein are: Grace McLaughlin; Bernard McLaughlin; Barbara Baroway; Leo Baroway and Barbara Krantzler Baroway Trust; The Estate of Leo Baroway; Gerald C. Crary; Phyllis Crary; The Estate of Gerald C. Crary, M.D.; Joseph Harrold; Marie Harrold; Harvey Gabler; Helen Gabler; Douglas J. McConnell, Jr.; Ruth Cole McConnell; Douglas McConnell & Associates, Inc.; Douglas McConnell & Associates Inc., Profit Sharing Trust; McConnell Revocable Trust; and Heller Financial, Inc. (hereafter Plaintiffs).

[2](1992) 10 Cal.App.4th 846 [13 Cal.Rptr.2d 318] (hereafter *Chatton*).

[3](1992) 10 Cal.App.4th 869 [13 Cal.Rptr.2d 295] (hereafter *Helfand*).

We reverse the judgments on all causes of action and direct entry of judgment in favor of National Union on three of them.[4]

## I. BACKGROUND

In the summer of 1986, the scores of individual investor suits were coordinated in order to try common issues of fact and law. The coordination judge set seven actions brought by thirteen investors as a "test case" for trial. These test cases were known as the McLaughlin actions. Plaintiffs therein are the same plaintiffs as in this insurance bad faith appeal. In August 1988, after a jury trial, these Plaintiffs obtained judgment against the inside directors of Technical Equities for approximately $4,250,000 in economic damages, $300,000 for emotional distress and $147 million in punitive damages. The next month more judgments were forthcoming: (1) the outside directors stipulated to judgments totalling $104 million in compensatory damages in favor of all plaintiffs in the coordinated litigation; and, (2) pursuant to an abbreviated court trial, 482 non-test-case plaintiffs obtained judgment totalling the same amount ($104 million) against inside directors.

Thereafter, numerous clusters of plaintiffs filed bad faith actions against National Union in the coordinated proceeding. Again, the court used the test case procedure and our same McLaughlin Plaintiffs went to trial in February 1990.

That same month the trial court entered significant rulings in the declaratory relief actions. It determined that the CGL policy provided coverage for investor claims against the officers and directors of Technical Equities under the bodily injury clause, inasmuch as the definition of bodily injury includes emotional distress. Implicitly it found that the wrongful activities of Technical Equities, through its officers and directors, were "occurrences" within

---

[4]On rehearing National Union has invited us to decide certain matters which it claims are likely to resurface on a retrial. These include the trial court's: (1) Exclusion of testimony of National Union's proposed experts, retired Justices Elwood Lui and Richard Amerian; (2) exclusion of a letter from the special master concerning the nature of Plaintiffs' demand; (3) refusal to admit evidence of the date of the trial court's decision in *Helfand*; (4) refusal to instruct that National Union did not violate Insurance Code section 790.03, subdivision (h) (hereafter, section 790.03(h)), unless its coverage position was unreasonable; (5) refusal to instruct·that an insured does not violate the statute by rejecting a settlement demand that would not resolve all claims against its insureds; and (6) refusal to instruct that a good faith belief concerning lack of coverage constitutes a defense to a punitive damage claim.

This case will be drastically reshaped in the event of a retrial. Some of these issues may never arise in the future; others will be substantially revamped. Under these circumstances we do not believe it is a productive use of judicial resources to resolve ancillary matters which are not pivotal to the determination of this appeal. Our decision to decline National Union's invitation to resolve these issues does not reflect on their merit and should *not* be interpreted as indicative of our approval of the rulings of the lower court.

the meaning of the policy. The court also resolved that the CGL availed $1 million in coverage per occurrence, with no limit on the aggregate number of occurrences.

Finally, the court declared that advertising injury stemming from unfair competition as defined in the Unfair Business Practices Act (Bus. & Prof. Code, § 17200 et seq., hereafter the Act) was covered under the advertising injury liability provisions of the policy, which afforded an aggregate limit of $1 million. (*Chatton, supra*, 10 Cal.App.4th at p. 851.)

With respect to the D & O policy, the trial court ruled that: (1) defense costs do not deplete the limits of liability available under the policy to pay for claims; (2) the policy limits were available for claims for all three years; and (3) a compromise agreement between Technical Equities and National Union whereby National Union would cancel the third policy year and issue a new policy covering postbankruptcy acts of its directors and officers was not binding on the *Helfand* plaintiffs or the officers and directors, notwithstanding bankruptcy court approval. (*Helfand, supra*, 10 Cal.App.4th at pp. 879, 884, 894.)

Having resolved the *Chatton* and *Helfand* coverage issues, the trial court then instructed the McLaughlin jury on the basis of those coverage determinations. In particular, it instructed that: (1) the D & O policy limits were $30 million; (2) defense costs were payable in addition to these limits; (3) cancellation of the third year of the D & O policy was invalid, "a bankruptcy order to the contrary notwithstanding"; (4) the bodily injury limits under the CGL policy were $1 million per occurrence with no limit on the number of occurrences; (5) the definition of "occurrence" under that policy "includes negligent misrepresentation"; (6) emotional distress is included in the CGL definition of bodily injury; and (7) the CGL policy provided coverage for advertising injuries, with an aggregate limit of $1 million.

The court submitted five causes of action to the jury. Four were assigned to Plaintiffs by the outside directors of Technical Equities in exchange for releases and covenants not to execute on the stipulated judgments entered against them in the investment fraud cases. The final was a direct cause of action against National Union for violation of section 790.03(h). Following general jury verdicts in favor of Plaintiffs, the court entered judgment against National Union in this test case for $5,943,165 in compensatory damages and $43 million in punitive damages. This McLaughlin case served as an audition on liability; the pertinent jury findings were then applied to claims of hundreds of other injured investors who obtained favorable judgments in Abelson v. National Union Fire Ins. Co., now on appeal to this court (A053939).

Meanwhile, National Union filed appeals in *Chatton* and *Helfand*. Long after the McLaughlin and Abelson judgments were entered, we rendered decisions which conclusively established there was *no* coverage for the investor claims under the CGL policy and the D & O policy limits were $20 million (not $30 million) *less* defense costs.

## II. THE JUDGMENTS ON THE FOUR ASSIGNED CAUSES OF ACTION MUST BE REVERSED

### A. *First Cause of Action: Breach of Covenant/Refusal to Accept Settlement Offer*

National Union first urges that we reverse the cause of action for breach of the implied covenant of good faith and fair dealing. We agree.

In their first assigned cause of action plaintiffs contended that National Union breached the implied covenant by failing to accept the $24 million settlement offer[5] of the plaintiffs' litigation group (PLG)[6] in the underlying suit against the directors and officers. The trial court specifically instructed the jury that to prove a violation of the defendant's duty of good faith and fair dealing under the insurance contract, Plaintiffs have the burden of proving: "1. That there was an underlying claim or action against an insured; [¶] 2. That the underlying claim or action asked for damages that were actually or potentially within the coverage of the policy. [¶] 3. That defendant National Union learned of this lawsuit. [¶] 4. That there was an offer to defendant National Union of a settlement of the underlying claim or action. [¶] 5. That this settlement offer was for an amount within the policy limits. [¶] 6. That this settlement offer was a reasonable offer. [¶] 7. That defendant National Union failed to accept this offer."

The erroneous instructions on coverage mandate reversal with directions to enter judgment for National Union on this cause of action. Plaintiffs cannot prove a pivotal element of their case—namely, a settlement offer

---

[5] Plaintiffs also suggest that their counsel made an earlier settlement demand of $10 million which National Union rejected. They allude to a September 1986 letter wherein counsel demanded that National Union deposit $10 million into an interpleader in superior court, but indicating that "no releases will be given on account of the payment of these funds" and, thus, "plaintiffs will continue to pursue this litigation to judgment." The only offer was to credit any judgment against each insured with a pro rata share of the proceeds paid over pursuant to the demand.

The September letter was a demand, but Plaintiffs must realize that by no stretch of imagination was it a settlement offer or demand.

[6] The PLG is a group of over 500 investors, including our test case plaintiffs, who made claims against the directors and officers of Technical Equities. It includes many, but not all, of the parties who lodged claims.

*within policy limits*—because *Chatton* and *Helfand* conclusively establish there was a $20 million coverage cap, *less* defense costs. The $24 million settlement exceeds available coverage. On the other hand, the jury for all practical purposes had no choice but to find bad faith liability, having been instructed there was $30 million plus defense costs available under the D & O policy and virtually unlimited coverage under the CGL policy.

Nor are we swayed by Plaintiffs' argument that an insurer can be liable for bad faith when there is a settlement offer in excess of policy limits and the insurer fails to inquire or ascertain whether the insured is willing to contribute the excess. (*Continental Cas. Co.* v. *United States Fid. & Guar. Co.* (N.D.Cal. 1981) 516 F.Supp. 384, 388-389, relying on *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858 [110 Cal.Rptr. 511].)

This argument comes too late in the litigation, after Plaintiffs honed a theory of recovery bolstered by well-crafted instructions for a certain finding of liability for unreasonable rejection of a settlement demand within policy limits. They cannot now insist National Union is responsible anyway because of other egregious behavior which they did not ask the jury to evaluate. (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; *Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].)

### B. *Fifth Cause of Action: Fraud*

National Union next seeks reversal of the fifth cause of action for fraud. The court instructed the jury on two theories: intentional misrepresentation and concealment. Through special interrogatories, the jury found that (1) National Union made material misrepresentations regarding the availability of coverage under both policies and (2) it failed to disclose the availability of coverage under the CGL policy.

### (1) *The Fraud Claims Are Assignable*

National Union first argues that neither fraud claim is assignable. We do not agree.

The general rule of assignability is set forth in our Civil Code: "A thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner." (Civ. Code, § 954.) The exception is confined to purely personal torts—those involving wrongs done to the person, reputation or feelings of the injured party are not assignable. (*Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 942 [132 Cal.Rptr. 424,

553 P.2d 584]; *Bush* v. *Superior Court* (1992) 10 Cal.App.4th 1374, 1381 [13 Cal.Rptr.2d 382].) Thus, a "naked" cause of action for fraud, "unconnected with any property or thing which had itself a legal existence and value independent of the right to sue for fraud" is not assignable. (*Jackson* v. *Deauville Holding Co.* (1933) 219 Cal. 498, 502 [27 P.2d 643].)

This is not the present situation. As Plaintiffs point out, National Union, as insurer of Technical Equities and its directors and officers, owed them certain duties, including, under appropriate circumstances, the duty to defend and the duty to pay judgments against them. Plaintiffs' theory is that National Union's purportedly fraudulent behavior in dealing with its insureds led to breaches of these duties with serious economic consequences. Such claims do not entail purely personal wrongs and, thus, they are assignable under the Civil Code.

### (2) *The Intentional Misrepresentation Claim Must Fail*

■ National Union is on the mark in asserting that Plaintiffs failed to prove a key element of their intentional misrepresentation theory. The alleged affirmative misrepresentations pertained to the scope and availability of coverage under both policies. The court correctly instructed the jury on the elements of this theory, including the need to prove that defendant made false representations; that the insureds were unaware of the falsity of the representations; that they acted "in reliance upon the truth of the representation" and "must have been justified in relying upon the representation."

First of all, as *Chatton* and *Helfand* show, National Union's position on coverage was "true"—not "false"—on all points except the matter of third year coverage under the D & O policy.

Second, as to that matter, Plaintiffs cannot prove reliance. The absence of detrimental reliance is fatal to recovery for fraud. (*Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 828 [250 Cal.Rptr. 220].) The plaintiff must have been deceived or misled by the falsity. (*Bank of St. Helena* v. *Lilienthal-Brayton Co.* (1928) 89 Cal.App. 258, 263 [264 P. 546].)

The outside officers and directors, in whose shoes Plaintiffs—as their assignees—stand, disputed National Union's position on coverage and did not act in reliance on its purported truth. Rather, they filed cross-complaints in *Helfand* contending that the limits of the D & O policy were either $20 million or $30 million and alleging that National Union breached its obligation of good faith by "*purporting*" to cancel the policy. Further, their attorneys demanded that National Union offer the full limits under the

D & O policy in settlement of their claims. As a matter of law these actions defeat a finding of reliance. Moreover, Plaintiffs have not pointed to any evidence that the insureds accepted National Union's coverage stance or believed it to be correct.

Instead, they argue that the insureds had no choice but to rely on National Union's misrepresentations. Their argument goes like this: National Union persisted in a begrudging, false position about coverage under the policies. Having locked into this stance, National Union then "forced" the insureds to sign an interim funding agreement, refusing to pay any defense fees until each insured signed on. In their words: "Counsel for the insureds were led to believe that their options were limited; either accept the interim funding agreement or be prepared to fight to [sic] National Union for any coverage at all." The restraints inherent in this interim arrangement "significantly harmed" the ability of the insureds to defend against the investor claims. Because of inadequate funds to conduct discovery for their defense, the insureds were compelled to stipulate to judgments against them.

Plaintiffs are positing liability for fraud not because the officers and directors were misled or deceived by National Union's statements concerning coverage, but because their financial straits compelled them to join the interim funding agreement. National Union may have engaged in heavy-handed tactics with respect to funding the defense, but that was not the legal theory of the fifth cause of action. Fraud requires justifiable reliance on a falsity, period.

### (3) The Concealment Claim Must Fail

The court also instructed the jury on fraud by concealment. Plaintiffs' theory here is that National Union concealed the existence of the CGL policy from the insureds; they did so to avoid the policy's first-dollar duty to defend without a deductible; and such failure to disclose significantly harmed the insureds because they were unable to obtain full information and funding for their defense and for development of their litigation strategy. Plaintiffs argue National Union had a duty to defend under the CGL because the policy afforded potential coverage for the investor claims under the bodily injury and property damage clause as well as the advertising injury clause. Given this duty, they were further duty bound to disclose its existence.

 The duty to defend ranges further than the duty to indemnify. It is established at the outset of the litigation and is fixed by facts which the insurer garners from the complaint and other sources which give rise to the

potential of liability under the policy. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275-277 [54 Cal.Rptr. 104, 419 P.2d 168]; *CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 605 [222 Cal.Rptr. 276].) However, while the duty to defend is broad, where there is no potential for recovery, there is no duty to defend. (*Dykstra* v. *Foremost Ins. Co.* (1993) 14 Cal.App.4th 361, 368 [17 Cal.Rptr.2d 543].)

(a) *There Was No Duty to Defend Under the Bodily Injury and Property Damage Clause*

■ The CGL policy provided coverage for bodily injury and property damage caused by an "occurrence." It defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured; . . ." In *Chatton* we held that the alleged misrepresentations of the insured officers and directors were not "occurrences" within the meaning of the policy. (*Chatton, supra*, 10 Cal.App.4th at p. 860.)

First, by definition an "occurrence" equates with an accidental event or act. Since intentional or fraudulent acts are purposeful, it follows they are not covered under a CGL policy. We went on to conclude that negligent misrepresentations causing loss of economic interest are purposeful rather than accidental for purposes of CGL coverage because they require intent to induce reliance and, thus, are a subspecies of fraud. (*Chatton, supra*, 10 Cal.App.4th at pp. 860-861.)

National Union's duty to defend under the bodily injury clause thus was triggered if there was any potential that the investors could recover damages based on accidental conduct of the directors and officers. *Chatton* is dispositive on Plaintiffs' fraud and misrepresentation claims. Under no stretch of facts could these claims fall within the purview of CGL coverage because they would necessarily involve proof of purposeful rather than accidental acts. (*Chatton, supra*, 10 Cal.App.4th at pp. 860-861; *Dykstra* v. *Foremost Ins. Co., supra*, 14 Cal.App.4th at pp. 368-369.) Accordingly, there was no duty to defend.

Plaintiffs point out that they also alleged breach of fiduciary duty and negligence against the insureds. Pertinent allegations include failure to prevent conduct of the investment schemes; failure to prevent disastrous financial results; and failure to prevent commingling of investment funds. They maintain that such allegations fit the "occurrence" shoe.

Whether or not these omissions were covered "occurrences," none of the damages sought were allowed under the policy and, hence, for this separate

reason, there was never a duty to defend. The McLaughlins, for example, alleged that as a proximate result of the tortious conduct of the directors, officers and others they suffered damages for economic losses as well as "mental, physical and emotional distress . . . ." However, damages for emotional distress are not attainable under the bodily injury clause of the CGL. The policy defines "bodily injury" as "bodily injury, sickness or disease . . . ." This clause limits coverage to physical injury to the body; it does not encompass nonphysical, emotional or mental harm. (*Chatton, supra,* 10 Cal.App.4th at p. 854.)

Moreover, the CGL did not cover the physical distress which Plaintiffs purportedly suffered. Plaintiffs' physical and emotional distress derived from their investment loss which in turn was negligently inflicted upon them by the insureds. First, the property damage coverage under the CGL extends only to physical injury to, or destruction or loss of use of, "tangible property." Damage for lost profits, loss of investment or other harm to one's economic interest constitute injuries to *intangible* property which by definition fall outside the scope of the policy. (*Chatton, supra,* 10 Cal.App.4th at pp. 857-858.).

Second, since Plaintiffs' physical distress was induced by an uncovered economic loss it defies reason that bodily injury coverage would nevertheless independently obtain. "It would expand coverage of [CGL] policies far beyond any reasonable expectation of the parties to sweep within their potential coverage any alleged emotional or physical distress that might result from economic loss that is itself clearly outside the scope of the policy. [Citation.]" (*Keating* v. *National Union Fire Ins.* (9th Cir. 1993) 995 F.2d 154, 156-157.)

### (b) *There Was No Duty to Defend Under the Advertising Injury Endorsement*

■ Plaintiffs also alleged conduct on the part of the insureds which was prohibited under the Act. They now claim such allegations were potentially covered under the advertising injury endorsement of the CGL. Not so, and hence there was no duty to defend these claims.

In *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1263-1264, 1272 [10 Cal.Rptr.2d 538, 833 P.2d 545] our Supreme Court held that the term "unfair competition" in the standard advertising liability endorsement does not embrace conduct prohibited under the Act. Rather, it refers only to the common law tort of unfair competition, which is generally synonymous with "passing off" one's goods as those of another. As we then pointed out

in *Chatton*, investors sued the officers and directors of Technical Equities for deceptive business practices violating the Act, not for the common law tort of competitive rivalry and, thus, they were not entitled to coverage under the advertising liability endorsement of the CGL. (*Chatton, supra,* 10 Cal.App.4th at p. 865.)

Plaintiffs do not and cannot suggest there is any factual basis for a cause of action based on a covered competitive injury. After all, they were investors in, not business competitors of, Technical Equities. They insist nevertheless that there was potential coverage because until the Supreme Court rendered *Bank of the West* in 1992, state and federal courts were split on whether the advertising injury endorsement insured against the type of business practices prohibited under the Act. The duty to defend depends on whether there is potential liability based on *facts* pled in the complaint or known to the insurer. There is no duty "where the only potential for liability turns on resolution of a legal question. . . ." (*State Farm Mut. Auto. Ins. Co. v. Longden* (1987) 197 Cal.App.3d 226, 233 [242 Cal.Rptr. 726].)

For all these reasons we reverse judgment on the fraud count and direct entry of judgment in National Union's favor.

### C. *Sixth Cause of Action: Negligent Misrepresentation*

The jury also found National Union liable for negligent misrepresentation. As with fraud, the court instructed the jury that justified reliance was an element of negligent misrepresentation. We have already established as a matter of law that the insureds did not rely on any representation National Union made with respect to coverage.

Included within the negligent misrepresentation instructions was an instruction on the duty of disclosure. As we have also demonstrated, since there is no coverage or duty to defend under the CGL, the insureds suffered no damage from the alleged nondisclosure of that policy. We thus reverse judgment on the negligent misrepresentation cause of action with directions to enter judgment for National Union.

### D. *Seventh Cause of Action: Wrongful Cancellation*

Plaintiffs also stated an assigned cause of action for wrongful cancellation of the D & O policy. In response to interrogatories, the jury found that National Union indeed had attempted to cancel the policy for an improper purpose. Although we agree with National Union that this action must be

reversed, we reject their argument that we should enter judgment in its favor on grounds that either (1) Plaintiffs cannot pursue an assigned bad faith claim absent a conclusive judicial determination of the assignor's liability; or (2) the cancellation caused no harm.

### (1) *The Stipulated Judgments Suffice to Support the Assignments*

The outside directors stipulated to entry of judgment against them for negligent misrepresentation and breach of fiduciary duty and assigned a percentage of their rights against National Union to the PLG. The amount of the judgments was to be determined by the jury's verdict on economic damages in the test cases against the *inside* directors. In consideration of the assignment, the PLG released those directors from all other claims and covenanted not to execute on the judgments.

A conclusive judicial determination is a prerequisite to prosecuting a surviving private right of action against an insurer for damages for unfair practices under section 790.03(h). (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 313 [250 Cal.Rptr. 116, 758 P.2d 58].[7]) Mere settlement of the underlying claim between the claimant and the insured tortfeasor is insufficient because the claimant would have to litigate the insured's liability in the statutory action against the carrier. This "trial within a trial" thwarts the policy of Evidence Code section 1155[8] by putting before the jury the fact of an insurance policy potentially covering the event that caused the harm. This evidence in turn could easily prejudice the jury's decision on liability of the insured tortfeasor. (46 Cal.3d at p. 311.)

On the other hand, a stipulation of the insured's liability, signed by insurer, insured and the third party claimant and entered as a judgment, satisfies *Moradi-Shalal*'s requirement of a conclusive judicial determination. (*California State Auto. Assn. Inter-Ins. Bureau* v. *Superior Court* (1990) 50 Cal.3d 658, 661-662 [268 Cal.Rptr. 284, 788 P.2d 1156] [hereafter C.S.A.A.].) First, a stipulated judgment is a judgment, and "entry thereof is a judicial act that a court has discretion to perform." (*Id.*, at p. 664.) While a court cannot change the agreement of the parties, it can reject a stipulation that is contrary to public policy. (*Ibid.*) Second and more importantly, where the insurer signs the stipulation and is privy to the agreement, it would be collaterally estopped from relitigating liability to the same extent as the insured. (*Id.*, at pp. 664-665.)

---

[7]*Moradi-Shalal* prospectively eliminated all such private actions; pending actions, including the present case which asserts a statutory claim, are spared. (46 Cal.3d at pp. 304-305.)

[8]This statute reads: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible to prove negligence or other wrongdoing."

A judgment against the insured (or actual payment by the insured in settlement of a claim) has also been held to be a precondition to his or her right to transfer a common law bad faith action against the insurer. (*Smith* v. *State Farm Mut. Auto. Ins. Co.* (1992) 5 Cal.App.4th 1104, 1114 [7 Cal.Rptr.2d 131].)

The *Smith* court reasoned that were assignments permitted prior to judgment against the insured, the parties would be faced with the same problems stemming from a "trial within a trial" as faced the *Moradi-Shalal* parties. (*Smith* v. *State Farm Mut. Auto. Ins. Co., supra,* 5 Cal.App.4th at p. 1112.) Further, prejudgment assignment of the bad faith claim severely compromises adjudication of the insured's liability because the necessary adversarial ingredient is missing. Indeed, the insured and claimant may appear to the trier of fact as allies. (*Id.*, at pp. 1112-1113.)

Moreover, a stipulated judgment combined with a covenant not to execute does not fit the bill for several reasons. First, the insurer will not be bound unless it enters the stipulation as was the case in *C.S.A.A.* Second, because the covenant absolutely protects the insured against personal exposure, the insured has no incentive to contest liability or damages. This dynamic invites collusion between claimants and the insured. (See *Smith* v. *State Farm Mut. Auto Ins. Co., supra,* 5 Cal.App.4th at p. 1114; *Doser* v. *Middlesex Mutual Ins. Co.* (1980) 101 Cal.App.3d 883, 892-893 [162 Cal.Rptr. 115]; *Wright* v. *Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1023 [14 Cal.Rptr.2d 588].)

*Smith* parts ways with the decision in *Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142] which upheld the insured's prejudgment assignment of a bad faith claim in exchange for a covenant to hold harmless. The court in *Critz* approved of this device because it promoted two important public policies: encouraging settlement, and equalizing the strategic advantages between insured and insurer. (*Id.*, at pp. 800-801.) On the other hand, the *Smith* court concluded that the policies disallowing prejudgment assignments override these countervailing concerns. (*Smith* v. *State Farm Mut. Auto Ins. Co., supra,* 5 Cal.App.4th at p. 1112.) It should be noted, however, that in *Critz* the injured party did not file suit against the insurer *until* she had secured a jury verdict against the insured tortfeasor.

While we appreciate the policy concerns which fueled the *Smith* decision, in our view the emerging rule is too rigid. *Smith* would never recognize a stipulated judgment coupled with a covenant not to execute, and signed only by the insured and the claimant, as supporting assignment to the claimant of the insured's bad faith action against the insurer.

The countervailing policy concerns explored in *Critz*, namely, those in favor of settlement and equalization of insured's and insurer's strategic advantages, are also important. Each case develops its own dynamic and has its own mix of procedures and circumstances which should be evaluated to determine whether the problems of collusion and prejudice are substantially diminished in that case. ■ We summarize the factors present in this case which lead us to conclude that Plaintiffs could legitimately proceed against National Union as assignees of the insured tortfeasors.

First, while liability was stipulated rather than adjudicated, the amount of damages was not. The agreement was that the amount of the judgments would be determined in relation to the amount of compensatory damages, if any, awarded the test case plaintiffs by the jury in the underlying trial against the inside directors. Specifically, the economic losses presented at trial would be based on calculations set forth in a certain accountancy firm report. If the jury awarded economic damages which bore a reasonable relationship to these calculations, then this same amount would be awarded in the stipulated judgments. This is exactly what happened. This procedure obviated the collusive possibility of stipulated, sky-high damages that bear no relation to the injured claimant's harm.

Second, the judgments were entered *after* the summary judgment motions of these outside directors and officers were denied. And, while denial of summary judgment does not mean they were liable, at least there were triable issues of fact as to liability and it cannot be said they were out of line in stipulating that there was a "substantial risk" of "being found by a jury to be liable to Plaintiffs with respect to claims by Plaintiffs for breach of fiduciary duty and negligent misrepresentation . . . ."

Third, although the covenant not to execute eliminated personal financial exposure for the judgments, the personal judgments still stand and can adversely affect the future credit and business transactions of the insureds. (See *Consolidated American Ins.* v. *Mike Soper Marine* (9th Cir. 1991) 951 F.2d 186, 190-191; *Critz* v. *Farmers Ins. Group, supra,* 230 Cal.App.2d at p. 803.)

Fourth, National Union had notice of the underlying litigation against the insured outside directors and was aware they might stipulate to liability. Counsel for the outside directors *urged and invited* National Union to participate and negotiate a settlement. National Union's position was as follows: "[I]t is the position of National Union that the former directors and officers of TEC should not be required to proceed through a trial to adjudication."

Finally, National Union encouraged these officers to enter stipulations of liability with protective covenants and, therefore, is estopped from attacking the validity of the judgments. Michael Mitrovic, the National Union executive in charge of D & O claims, testified in deposition: "I believe National Union was encouraging the directors and officers to enter into stipulated judgments in or about March 1988 so that the directors and officers wouldn't be compelled to go to trial. I think National Union was also . . . advising defense counsel of the insureds to insulate their clients from potential personal asset exposure by getting a non-recourse type of provision as part of the stipulated settlement with the plaintiffs. The thought being that once the stipulated settlement was entered into that the plaintiffs would have to submit their claim to the bankruptcy court and stand in line as an insured creditor against the policy limits which were the—which had been interpleaded by National Union in bankruptcy court." Question: "So is it correct then that you were aware that certain of the outside directors were planning to enter into stipulated judgments with the plaintiffs before it actual [*sic*] occurred?" Answer: "I would take it one step further. I think we were encouraging stipulated judgments. . . ."

In light of the above, we agree with Plaintiffs that National Union cannot now complain that liability should have been tested in a more adversarial proceeding.[9]

### (2) *Factual Background Regarding Attempted Cancellation*

The background on attempted cancellation of third year coverage is as follows: Technical Equities had prepaid its premiums for the three-year D & O policy. It notified National Union of potential claims under the policy

---

[9]National Union emphasizes that Mitrovic later testified that his company only encouraged the directors to stipulate to liquidated sums in the bankruptcy interpleader action. Additionally, Attorney Michael Perlis, who represented National Union during settlement negotiations, testified that National Union did not perceive the need for entry of judgment against the insureds, but was advising that stipulation to a liquidated sum in the bankruptcy interpleader action would be in order. Finally, National Union complains that the proposed stipulation which they did see provided that the judgment would have no collateral estoppel or res judicata effect, when in reality the stipulated judgments actually entered against the outside directors stated there would be no preclusion in any other proceeding *except insurance coverage litigation* arising out of the actions.

These points and nuances do not change our minds. The bottom line is that National Union did not want the outside directors to proceed to trial, it did not have a problem with a stipulation to liability for purposes of dividing up the amount of insurance proceeds which it acknowledged was available under the D & O policy, and it did not have a problem with insulating the insureds from personal liability. National Union said as much when the court was considering Plaintiffs' *in limine* motion for entry of an order for a finding of estoppel to attack liability, and yet in the same breath said the deal that the insureds and investors agreed to was collusive. The trial court correctly granted plaintiffs' motion.

on January 30, 1986. As lawsuits mounted against the directors and officers, they began tendering defense to National Union.

In May 1986, National Union gave Technical Equities written notice of cancellation. Ultimately, counsel for National Union and Technical Equities struck a compromise, whereby the existing policy would be cancelled and a new policy would issue covering postbankruptcy acts of the directors and officers. The bankruptcy court approved this compromise at a hearing unattended by any of the affected officers and directors.

### (3) *The Helfand Decision*

In *Helfand* we upheld as supported by substantial evidence the trial court's finding that the original attempted cancellation was arbitrary and without legal justification. We explained: "The attempted cancellation was arbitrary because it was based on mere allegations of fraud that were not tested by any verification. Moreover, as Cavallaro[10] the decisionmaker, put it, nearly *all* D&O claims are accompanied by allegations of fraud. Yet this was the only cancellation he could remember involving a bankrupt, prepaid company. Further, the purported cancellation was across the board, sweeping aside numerous officers and directors which Cavallaro could not associate with allegations of gross misconduct. This, when loss reasonably foreseeable at the policy's inception, is imminent and unavoidable on the part of the prepaid insured at the time of cancellation. . . . National Union's willingness to help Technical Equities [as debtor in possession (DIP)], by issuing a new, one-year, $5 million policy in favor of DIP directors and officers does not alleviate its obligations to the insured former directors and officers of the prebankrupt entity. How can a policy which excludes wrongful prebankruptcy acts help them at all? The answer is that the new deal solely benefitted National Union and Technical Equities, DIP. [¶] An arbitrary cancellation is a breach of the covenant of good faith and fair dealing. . . . To exercise [the discretionary power to cancel arbitrarily] is inconsistent with the party's justified expectations." (*Helfand, supra,* 10 Cal.App.4th at pp. 905-906, fn. omitted, italics in original.)

### (4) *National Union's Contentions*

National Union comes now to complain that as a matter of law, the "wrongful cancellation" did not cause the insured outside directors any

---

[10]Christopher Cavallaro, National Union's senior vice-president in charge of underwriting D & O insurance, made the decision to cancel the policy.

damages and, thus, we must reverse the seventh cause of action and enter judgment in its favor. We reverse the seventh cause, but will not direct judgment for National Union.

In *Helfand* we held that the cancellation was ineffective and, thus, the $10 million in third year proceeds, less defense costs as applicable, was available to pay claims against the officers and directors of Technical Equities. Thus, despite the attempted cancellation, to our knowledge third year proceeds have been or will be interpled in bankruptcy court and the directors and officers are not damaged by that amount.

National Union then reasons that since the insureds now have the benefit of the third year proceeds, they cannot also seek damages allegedly caused by the attempted cancellation of third year coverage, citing us to Couch: "[T]he insured cannot treat the contract as at an end for the purpose of recovering damages for its breach and thereafter seek to have it treated as in force, such remedies being inconsistent." (17 Couch on Insurance (2d ed. 1967) § 67:428, p. 653, fn. omitted.) The problem with this reasoning is that the directors and officers assigned their causes of action for wrongful cancellation as a tortious breach of the covenant of good faith and fair dealing, not as a contract claim. They legitimately can seek recovery for all damages proximately caused by National Union's bad faith conduct in attempting to arbitrarily cancel third year coverage under the D & O policy. The outside directors were deprived of the assurance of $10 million in third year proceeds at a critical time when faced with deciding how to defend the massive lawsuits against them. We cannot say as a matter of law that they suffered no harm from National Union's tortious attempt to cut off third year funding, notwithstanding the ultimate availability of proceeds for that year.

National Union also maintains that there are no compensable damages recoverable in this case. Recoverable damages include the difference in premiums between the cancelled policy and a replacement policy; damage to professional reputation; and resulting emotional distress and punitive damages. (*Spindle* v. *Travelers Ins. Companies* (1977) 66 Cal.App.3d 951, 955-956 [136 Cal.Rptr. 404].) Plaintiffs did not claim these damages nor do they apply. Rather, they claimed the full amount of the stipulated judgments obtained against the outside directors as damages on their assigned causes of action.

National Union assumes that since this would be the measure of damages for wrongful refusal to settle, we must likewise reverse this cause with entry of judgment for National Union as we did with respect to the first cause of action. Not so. Plaintiffs, as assignees of the outside directors and officers,

are entitled to all damages proximately caused by the attempted cancellation except for punitive damages and emotional distress.

### (5) *Reversal Is Necessary*

 However, we cannot affirm the judgment on this cause of action. The problem here is this: The court correctly instructed the jury that to establish a claim for wrongful cancellation, Plaintiffs must prove (1) that the cancellation was a proximate cause of damages suffered by the officers and directors and (2) the nature and extent of such damages. However, the verdict form cancelled out this instruction. Under "DAMAGES" the form directed the jury that if the defendant is found liable for any of the assigned causes of action, then it should respond "Yes" or "No" to the following question: "[D]o you find that as a proximate result of the conduct of defendant National Union Fire Insurance Company, judgments were entered against its insureds in favor of plaintiffs . . . , which judgments are the proper amount of damages to be awarded against defendant?" If the jury responded "Yes," the form noted that the court would calculate the precise amount of damages; it gave no further instruction if the jury answered "No." The court in effect instructed the jury that damages, if any, were the amount of the stipulated judgments thereby precluding it from entertaining any other measure of damages.

This problem is compounded by the fact that the jury was also seriously misinformed about the amount of coverage available under both policies, through instructions which recited as "conclusively proven" the prior trial court determinations on coverage. These included instructions that the D & O policy limits were $30 million *plus* reasonable defense costs and that the CGL permitted virtually unlimited coverage.

On top of this, we have now determined that the other theories of liability on the assigned causes must fall completely, in large measure again because of the erroneous coverage instructions. Inasmuch as there was a general verdict plus interrogatories indicating the jury found liability on all assigned causes, it is impossible to determine if the jury would attribute the full amount of damages solely to the wrongful cancellation claim. Had the jury been presented with just the wrongful cancellation claim, with proper coverage instructions and with a verdict form that did not call for an all-or-nothing approach to damages based on the amount of the stipulated judgments, we are persuaded it is more likely than not that it would have either: (1) defeated the wrongful cancellation claim on the basis that it did not harm the insureds; or (2) concluded that the harm suffered was something less than the full amount of the stipulated judgments. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Plaintiffs presented a package deal to the jury; their theory of damages was part of that deal. Their position was that National Union's wrongful acts, including the attempted cancellation, damaged the insureds by depriving them at a critical time of the full complement of funds and support due them under the policies for conducting their defense against Plaintiffs' claims. This deprivation in turn forced them to stipulate to judgments against them. Underlying this theory of course is the notion that had they been fully funded, they would have defeated Plaintiffs' claims! Once the alleged facts that support this theory begin to unravel in part, it becomes impossible to avert prejudice even when one tort remains as a viable cause of action.

### III. THE STATUTORY CAUSE OF ACTION MUST BE REVERSED

#### A. *Violation of Section 790.03(h)*

Plaintiffs' direct cause of action against National Union for violation of section 790.03(h) was significant because it permitted judgments for damages for emotional distress as well as punitive damages. Through special interrogatories the jury identified four unfair claims settlement practices engaged in by National Union: (1) failure to acknowledge and act reasonably promptly upon communications with respect to claims arising under the CGL policy; (2) failure to adopt and implement reasonable standards for prompt investigation and processing of claims arising under both policies; (3) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear; and (4) failure to provide promptly a reasonable explanation of the factual or legal basis relied on for denying claims or an offer of a compromise settlement.

We analyze each possible basis for liability.

#### (1) *Failure to Respond Promptly to Communications About Claims*

Section 790.03(h)(2), provides that an insurer commits an unfair practice by "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." This is a direct cause of action. Plaintiffs have pointed to no evidence in the record, nor do we find any, where they, or their attorneys on their behalf, communicated with National Union about claims under the CGL policy and National Union failed to respond. Even if they could complain about National Union's dilatory behavior with respect to acting on communications from its own insureds about the CGL policy, they have failed to articulate a theory of how this behavior harmed them. Nor do we see one. Whether or not National Union lagged in communicating about investor claims tendered

under the CGL policy, in reality Plaintiffs stood to receive nothing because we have determined there was no CGL coverage.

### (2) *Investigation and Processing*

■■■ An insurer also commits an unfair practice by "[f]ailing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies." (§ 790.03(h)(3).) Since there was no coverage to pay claims under the CGL policy, there was no harm to plaintiffs, no matter how delinquent National Union was in investigating or processing claims.

With respect to the D & O policy, Michael Mitrovic testified he wanted to settle as quickly as possible for $10 million, the amount he asserted was the policy limits. It made no difference to him if the lawsuits had merit or not; unless the parties settled, the litigation would go on and the limits "would have been entirely chewed up by defense expenses . . . ."

Defense costs would in fact reduce the proceeds available to plaintiffs. (*Helfand, supra,* 10 Cal.App.4th at p. 880.) The trial court's instruction to the contrary would tend to undermine the jury's receptivity toward Mitrovic's testimony on this point. And, while the limits of liability were $20 million, not $10 million, as National Union points out, the main obstacle to settlement was this dispute concerning the amount of coverage, not any failure to investigate or process claims. In any event, once again the erroneous coverage instructions defeat Plaintiffs' claim. However, we do not accept National Union's position that its conduct was reasonable as a matter of law. The jury could doubt the sincerity of Mitrovic's belief that there was only $10 million in coverage. And, while it may be reasonable to assume $10 million would be eaten up in defense costs, doubling the amount might change one's perspective. If the jury were to reject all or part of National Union's "reasonableness" defense, it might also find that the duty to implement standards for promptly investigating and processing claims would also kick in. At that point Plaintiffs would be entitled to damages proximately caused by lapse of that duty.

### (3) *Failure to Settle*

■■■ An insurer engages in an unfair practice by "[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." (§ 790.03(h)(5).) The erroneous instructions on coverage gave the jury a false impression about National Union's obligations and undoubtedly contributed to its conclusion that National Union failed to attempt in good faith to settle their claims. National

Union argues that it acted reasonably and in good faith by filing an interpleader. In August 1987, National Union did lodge an $8.5 million undertaking in bankruptcy court.[11] It later increased the bond to $10 million.[12]

Our point is that to the extent the judgment on the statutory claim is based on section 790.03(h)(5), it must be reversed because of obvious prejudice stemming from the coverage instructions. However, we cannot say as a matter of law that National Union behaved in a reasonable manner or acted in good faith by interpleading a $10 million bond. We know the D & O policy affords $20—not $10—million in coverage. Section 790.03(h)(5) sweeps in a broader range of behavior than Plaintiffs' first assigned cause of action for rejection of a settlement demand *within policy limits*. Thus, while we must reverse, we do not enter judgment for National Union.

### (4) *Failure to Provide Explanation*

The jury also found that National Union violated section 790.03(h)(13) which identifies the following unfair practice: "Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement."

National Union argues there is no evidence to support liability under section 790.03(h)(13), although the jury found to the contrary. We agree with National Union.

With respect to the D & O policy, the record reveals that National Union's position was always clear: there was $10 million to pay claims and defense costs. Settlement discussions broke down. Plaintiffs made a settlement demand of $24 million by letter of August 12, 1987. National Union's "response" was to interplead $8.5 million in bankruptcy court that same month. Then in January 1988, if matters were not already clear, National Union filed a cross-motion for summary judgment in the *Helfand* case, therein laying out its position on the limits of the D & O policy. Even counsel for Plaintiffs conceded in closing argument that National Union provided a prompt basis for denying claims under the D & O policy.

As to the CGL policy, at this point, given there is no coverage thereunder, we discern no economic damages that could possibly arise from any failure to explain the basis for denying a claim. Nor have Plaintiffs articulated any

---

[11]In fact, Plaintiffs had demanded interpleader of $10 million in cash in superior court as early as September 1986.

[12]The fund, being in the form of a bond, does not draw interest.

such explanation. With respect to emotional distress damages, the Plaintiffs who attempted to prove up these damages[13] all spoke of distress arising from failure of National Union or Technical Equities to pay their claims, not from any failure to explain why National Union denied their claims.

## B. *Damages for Emotional Distress; Punitive Damages*

Since we are reversing the direct statutory cause of action which alone permitted the jury to award punitive damages and damages for emotional distress, those awards automatically are reversed as well. However, we also emphasize that in an insurance bad faith case, it is plaintiff's burden to prove that he or she actually suffered emotional distress as a result of the insurer's tortious conduct. (*Austero* v. *Washington National Ins. Co.* (1982) 132 Cal.App.3d 408, 417 [182 Cal.Rptr. 919].)

A number of investors, because of illness and advanced age, did not testify. Counsel for certain Plaintiffs conceded in closing argument that there was no basis for awarding emotional distress damages to those victims who did not testify. Notwithstanding this admonition, the jury returned emotional distress awards for all individuals. This is impermissible. Plaintiffs now argue an inference drawn from evidence of the insurer's conduct will suffice. It will not. Plaintiffs must show actual damage; proof of defendant's bad faith is not enough. The rule in *personal injury* cases that damages for pain and suffering generally can be inferred from the nature, extent, severity and treatment of the injury (see *Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 413 [196 Cal.Rptr. 117]; Johns, Cal. Damages—Law and

---

[13]*Grace McLaughlin*: As a result of Technical Equities losses and nonpayment of judgments, she has suffered a "[f]ew sleepless nights, wakening and still do [*sic*]."

*Marie Harrold*: When she learned that National Union didn't "want to pay" this information had an "effect" on her that "wasn't good."

*Harvey Gabler* was personally and professionally disappointed upon learning that National Union was proposing $10 million "to take care of everything." He felt "dismay" that, four years later, he was litigating an insurance company over benefits he understood were due under the policy. This "shook" his "faith" in the whole insurance system.

*Helen Gabler* was "upset," "angry," "distress[ed]" and "very mad" that her judgment was not going to be paid; she was not at all sure about her other insurance any more.

*Douglas McConnell* was "very disappointed" when his judgment against the directors and officers was not paid; he also testified that when his wife learned National Union would not pay the judgments, her health started "going down"; she was "just flabbergasted," "very upset" and has "gotten to where she won't take any trips." The nonpayment by National Union has also affected his feelings about security.

*Barbara Baroway* testified that as a result of National Union's nonpayment, "[i]t's been a nightmare. It's brought back all the very painful memories that surround the endings of Technical Equities, the bankruptcy, then my husband's illness and the sadness, the fact that it wasn't settled before he died. . . . [¶] It just brought back all the pain and sleepless nights and the depression, anxiety."

Proof (4th ed. 1992) § 1.32) does not pertain here. Plaintiffs Gerald Crary, Phyllis Crary and Joseph Harrold thus cannot recover emotional distress damages because they did not testify and there was no other evidence that they suffered emotional distress.[14]

A word about punitive damages is also in order. The only compensatory damages assessed on the statutory cause of action were those for emotional distress. Nonetheless, the jury awarded punitive damages to certain Plaintiffs who either did not prove emotional distress damages (the Crary's; Joseph Harrold; Bernard McLaughlin and James McLaughlin)[15] or who could not suffer such damages (corporate Plaintiff Heller Financial).

In California there is no separate cause of action for punitive damages. Plaintiffs must still prove the underlying tortious act causing actual, presumed or, where the difficulty lies in fixing the amount of damages with certainty, nominal damages. (See *Clark* v. *McClurg* (1932) 215 Cal. 279, 282-284 [9 P.2d 505, 81 A.L.R. 908]; *Sterling Drug, Inc.* v. *Benatar* (1950) 99 Cal.App.2d 393, 400, 402 [221 P.2d 965].)

National Union argues that the investors who did not and cannot actually recover compensatory damages on their statutory claim likewise are not entitled to punitive damages. It relies on *Mother Cobb's Chicken T., Inc.* v. *Fox* (1937) 10 Cal.2d 203, 205-206 [73 P.2d 1185]: " 'Actual damages must be found as a predicate for exemplary damages. . . .' [¶] . . . [P]unitive damages are never more than an incident to a cause of action for actual damages, and, when allowed, are allowed only *in addition to recovered actual damages*." (Italics added.)

Plaintiffs argue persuasively on rehearing that *Mother Cobb's* must be read in context of subsequent authority which establishes that punitive damages can be assessed where actual injury is sustained and proven, without regard to whether compensatory damages are sought or obtained. For example, our Supreme Court has explained the relationship between punitive and actual damages, as follows: "The issue of exemplary damages is separate and distinct from that of actual damages, for they are assessed to punish the defendant and not to compensate for any loss suffered by the plaintiff. The rule that exemplary damages cannot be imposed unless the plaintiff has suffered actual damages [citations] is based on the principle that the defendant must have committed a tortious act before exemplary damages

---

[14]Ruth McConnell also did not testify. However, her husband testified about her suffering.
[15]Bernard and James McLaughlin did not testify, evidence of their emotional distress was not otherwise introduced, and the jury did not award them any emotional distress damages.

can be assessed. . . . In view of the jury's verdict and the award of general damages in this case the commission of a tortious act by defendants is established." (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801-802 [197 P.2d 713].)

In line with *Brewer*, reviewing courts have concluded that recovery of compensatory damages is not essential. (See *Topanga Co.* v. *Gentile* (1967) 249 Cal.App.2d 681 [58 Cal.Rptr. 713] [trial court not precluded from awarding punitive damages where it directed defrauding shareholders to surrender the portion of their shares which exceeded their capital contribution]; *Esparza* v. *Specht* (1976) 55 Cal.App.3d 1, 9 [127 Cal.Rptr. 493] [recovery in the form of an offset suffices].) Similarly, in *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742-743 [336 P.2d 534], our Supreme Court approved punitive damages on an unjust enrichment theory of recovery for disgorgement of secret profits as opposed to recovery of out-of-pocket losses.

Taking these concepts even further, entitlement to punitive damages has been affirmed for violations of section 790.03(h) and breach of fiduciary duty where the judgment for damages for emotional distress, constituting the only nonpunitive relief granted, was overturned. (*Gagnon* v. *Continental Casualty Co.* (1989) 211 Cal.App.3d 1598, 1601, 1605-1606 [260 Cal.Rptr. 305].)[16] In *Gagnon* the main issue concerned defendant insurer's proposed instruction on the "reasonable relation" between punitive damages and the harm suffered. The extant BAJI instruction referred to the relationship of punitive damages "to the actual damages." (Former BAJI No. 14.71 (7th ed. 1986.)

The trial court refused to give any "reasonable relation" instruction, apparently fearing that since plaintiff, in her representative capacity, was not entitled to compensatory damages for further disability benefits or emotional distress, the jury might deliver a low amount of punitive damages. (*Gagnon* v. *Continental Casualty Co., supra*, 211 Cal.App.3d at p. 1603.) On the other hand the appellate court concluded that where "punitive but not compensatory damages are available to the plaintiff, the defendant is entitled to an instruction that punitive damages must bear a reasonable relation to the

---

[16]Plaintiff prosecuted the action against the disability benefits insurer of her deceased husband both as executrix of his estate and in her individual capacity. The reviewing court apparently reversed the judgment for emotional distress damages because Mrs. Gagnon lacked standing as an individual to assert the statutory violations. (211 Cal.App.3d at p. 1601.)

injury, harm or damage actually suffered by the plaintiff and proved at trial." (*Id.*, at p. 1605.)[17]

The court in *Gagnon* did acknowledge that compensatory damages are a convenient measure of injury suffered by a plaintiff, but reasoned that courts should focus instead on the nature and degree of actual harm suffered, not some bottom-line amount of compensatory damages. (*Gagnon* v. *Continental Casualty Co., supra*, 211 Cal.App.3d at pp. 1603-1604.) While in the abstract this analysis makes sense, the *Gagnon* opinion contains not a clue as to how Mrs. Gagnon, in her representative capacity, would prove actual harm stemming from the insurer's issuance of a misleading brochure and unfair settlement attempts, given she was not entitled to compensatory damages for disability benefits or emotional distress. After all, one must prove a prima facie case of liability.

 In any event, to pursue a surviving cause of action under section 790.03(h), a plaintiff must allege and prove he or she has suffered damages due to the unfair practice. (Kornblum et al., Cal. Practice Guide: Bad Faith (The Rutter Group 1990) § 9:23:1, p. 9-9.) Plaintiffs on rehearing suggest that actual damages for investors who cannot recover for emotional distress might include economic damages such as loss of future earnings and profits, costs of borrowing and loss of property. On retrial, if any, they will have to prove such damages as a predicate for exemplary damages.

Finally, we respond to National Union's claim that there was no evidence it was guilty of malice, fraud or oppression. Here, National Union attempts to put its own gloss on the evidence. Discerning nuances, deciding whether or not to believe or take a witness seriously, deciding whether behavior was reasonable and whether expressed concerns, etc., were legitimate—these are all within the province of the jury. We cannot say as a matter of law that National Union's handling of claims and settlement offers was not malicious, fraudulent or oppressive.

## IV. DISPOSITION

We reverse the judgment on the four assigned causes of action, with directions to enter judgment for National Union on the first (breach of covenant/failure to settle), fifth (fraud), and sixth (negligent misrepresentation) causes of action. We reverse the judgment on the ninth cause of action for violation of section 790.03(h), together with the attendant emotional

---

[17]BAJI No. 14.71 (1991 re-rev.) (7th ed. 1992 pocket pt.) has subsequently been revised in light of *Gagnon.*

distress and punitive damages awards. Consistent with this opinion, any retrial under section 790.03(h)(2) or (13) would be inappropriate.[18]

Plaintiffs to pay costs on appeal.

Perley, J., and Reardon, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 30, 1994.

---

[18]National Union has asked us on rehearing to order this cause retried before a different judge. We decline the invitation.

First, we have no reason to believe that the trial court, on remand, and after studying this opinion, will be other than fair and attentive to following the law. Second, to do so would be contrary to the purposes and procedures for coordinated proceedings. (Code Civ. Proc., §§ 404.3, subd. (a), 404.7; Cal. Rules of Court, rules 1540, 1543, 1545.)