[No. A053939. First Dist., Div. Four. Sept. 26, 1994.]

MARK ABELSON et al., Plaintiffs and Appellants, v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PA., Defendant and Appellant.

## COUNSEL

Cotchett, Illston & Pitre, Joseph W. Cotchett, Susan Illston, Marie Seth Weiner, Thomas T. Anderson & Associates, Thomas T. Anderson, Samuel Trussell, Morgan, Ruby, Schofield, Franich & Fredkin and Allen J. Ruby for Plaintiffs and Appellants.

Pettit & Martin, D. Wayne Jeffries, Saul D. Bercovitch, Stroock & Stroock & Lavan, Michael F. Perlis, Robinson & Wood, Archie S. Robinson, Thomas R. Fellows, Horvitz & Levy, Ellis J. Horvitz, Peter Abrahams, Stephen E. Norris and Lisa Perrochet for Defendant and Appellant.

## OPINION

**ANDERSON, P. J.—**

### I. INTRODUCTION

#### A. *Background*

This is an appeal and cross-appeal from the second multimillion dollar judgment rendered in bad faith actions brought by investors in Technical Equities Corporation (Technical Equities) against National Union,[1] the company's primary insurance carrier. Respondents and cross-appellants herein are the plaintiff-investors in what has become known as the *Abelson* actions (hereafter, plaintiffs or *Abelson* plaintiffs).

Technical Equities was a diversified financial services company which offered an array of investment services. Following its financial collapse in February 1986, hundreds of investors successfully sued the company's officers and directors for fraud, negligent misrepresentation, breach of fiduciary duty and negligence. The scores of individual suits had been coordinated in order to try common issues of law and fact.

National Union insured Technical Equities under a directors and officers liability policy (D & O policy) as well as a comprehensive general liability

---

[1]Defendant and appellant herein is National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union).

policy (CGL policy). Coverage disputes arose at the inception of the coordinated investor litigation. Several plaintiffs pursued two declaratory relief actions to resolve key coverage issues under the policies. The trial court entered declaratory judgments favoring broad coverage under both policies. These judgments paved the way for resounding trial court victories in a "test case" prosecuted by 13 plaintiffs against National Union. These test cases were known as the *McLaughlin* actions.

## B. *The Abelson Trial and Judgment*

At the trial court level, the judgment in the *McLaughlin* test case served as an audition on liability for the present *Abelson* action involving approximately 650 investors. Specifically, on plaintiffs' motion for summary adjudication the court ruled that principles of "limited purpose" issue preclusion should apply to prevent retrial of certain liability issues. The court thus deemed the following matters established without need for further proof: (a) that the *Abelson* actions all shared common questions of fact and law with the previously tried *McLaughlin* actions and (b) therefore National Union was liable to plaintiffs on the same five causes of action[2] that went to judgment in *McLaughlin*, namely: (1) breach of the duty of good faith and fair dealing; (2) fraud; (3) negligent misrepresentation; (4) wrongful cancellation of insurance policy; and (5) violation of section 790.03, subdivision (h)(2), (h)(3), (h)(5) and (h)(13).

Further, the court determined that plaintiffs sustained economic damages on the assigned causes of action in an amount equal to the amount of each party's judgment against the outside directors, less offsets for settlements with other defendants, plus statutory interest. This amount totalled $114 million.

Additionally, the court dismissed plaintiffs' punitive damage claims on the theory that the issue of punitive damages had been tried as to them in the *McLaughlin* case. The case then proceeded to jury trial on the remaining issue of damages for emotional distress on the statutory cause. Three hundred thirty-six witnesses testified. The jury awarded approximately $6,250,000 in emotional distress damages to 172 plaintiffs. The total judgment on the five causes of action, as amended, came to approximately $121,788,000.

---

[2]The first four causes of action were assigned to plaintiffs by the outside directors of Technical Equities in exchange for releases and covenants not to execute on stipulated judgments entered against them in the investment fraud cases. The final action for violation of Insurance Code section 790.03, subdivision (h) (hereafter, section 790.03(h)), was a direct action against National Union.

Meanwhile, National Union appealed both declaratory judgments. In *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846 [13 Cal.Rptr.2d 318] (interpreting the CGL policy) and *Helfand* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869 [13 Cal.Rptr.2d 295] (interpreting the D & O policy) we, respectively, overturned and substantially overturned these judgments. These reversals in turn compelled reversal of the *McLaughlin* judgment. (*McLaughlin* v. *National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132 [29 Cal.Rptr.2d 559], review denied June 30, 1994 (*McLaughlin*).)

## II. NATIONAL UNION'S APPEAL

 National Union seeks reversal of the entire judgment. The court below held National Union liable under the same theories, and on the same facts, advanced in *McLaughlin*. We reversed all causes of action in *McLaughlin*. (*McLaughlin, supra*, 23 Cal.App.4th at p. 1166.) Therefore, the *Abelson* judgment must fall on parallel lines.

### A. *Assigned Causes of Action*

In accordance with *McLaughlin*, we reverse the judgment on the four assigned causes of action, with directions to enter judgment for National Union on the first (breach of covenant/failure to settle), fifth (fraud) and sixth (negligent misrepresentation) causes of action. (*McLaughlin, supra*, 23 Cal.App.4th at p. 1166.)

### B. *Statutory Cause of Action*

 As a threshold matter we respond to National Union's concern that plaintiffs had "no standing" to pursue their claim for violation of section 790.03(h). We are mindful that a final judicial determination of the insured's liability is a condition precedent to a claimant's "surviving" third party cause of action against an insurer. (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 313 [250 Cal.Rptr. 116, 758 P.2d 58].)[3] We are also mindful that the posture of the *Abelson* plaintiffs differs from that of the

---

[3]In *Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra*, 46 Cal.3d at pages 304-305, the Supreme Court overruled *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], holding that third party claimants have no private right of action against insurers under section 790.03(h). However, in recognition of the numerous plaintiffs who had initiated section 790.03(h) suits in reliance on *Royal Globe*, the Supreme Court resolved that its decision would not apply to cases filed before its decision became final. (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra*, 46 Cal.3d at p. 305.)

*McLaughlin* plaintiffs in that the latter obtained jury verdicts in their favor establishing liability on the part of the inside directors of Technical Equities.

On the other hand, although the claims of the *Abelson* plaintiffs against certain inside directors originally were set for an October 3, 1988, trial, they requested, and received, an abbreviated court trial on September 16, 1988,[4] instead. Additionally, prior to that trial the outside directors had stipulated to judgments[5] totalling $104 million in compensatory damages in favor of all plaintiffs in the coordinated litigation. The court entered those judgments on September 12, 1988.

National Union ardently maintains that neither form of judgment reflects a conclusive judicial determination of the insureds' liability, the *Moradi-Shalal* precondition to maintaining a statutory cause of action against an insurer. At the trial level, National Union argued unsuccessfully that it should be allowed to introduce collateral evidence to attack the substance of *all* judgments entered in favor of the *Abelson* plaintiffs against the insured officers and directors. Without delving into the sufficiency of the September 16 judgments to support plaintiffs' statutory claims, we conclude that the stipulated judgments satisfy the conclusive judicial determination requirement.

■ Prosecution of a surviving statutory action against an insurer cannot proceed from mere settlement of the underlying action. (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra,* 46 Cal.3d at p. 306.) However, a stipulation of the insured's liability signed by the insurer, insured and third party claimant and entered as a judgment is a conclusive judicial determination within the teachings of *Moradi-Shalal.* (*California State Auto. Assn.*

As of August 18, 1988, when the Supreme Court filed *Moradi-Shalal,* that decision was to become final 60 days later on September 17, 1988. However, the Supreme Court subsequently denied a petition for rehearing. The effective date of that order and the date the decision became final was October 17, 1988. (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra,* 46 Cal.3d at p. 321.)

[4] As National Union points out, this is one day before *Moradi-Shalal* initially was to become final.

[5] Specifically, these directors stipulated to entry of judgment against them for negligent misrepresentation and breach of fiduciary duty and assigned a portion of their rights against National Union to the *McLaughlin* and *Abelson* plaintiffs in exchange for releases and covenants not to execute on the stipulated judgments. The amount of damages awarded under the judgments would be in proportion to calculations set forth in an expert accountancy firm report, provided that the damages awarded to test case plaintiffs by the jury in the underlying trial against the inside directors bore a reasonable relationship to these calculations. Jury verdicts were in fact entered in favor of the test case (*McLaughlin*) plaintiffs in relation to the expert's calculations.

*Inter-Ins. Bureau* v. *Superior Court* (1990) 50 Cal.3d 658, 662 [268 Cal.Rptr. 284, 788 P.2d 1156] (*C.S.A.A.*).) First, a stipulated judgment is a judgment and, although the court cannot alter the terms, it has discretion to enter the judgment or not, and can reject a stipulation as against public policy. Second and more importantly, an insurer that signs the stipulation wherein the insured admits liability is privy to the agreement and can be collaterally estopped from relitigating liability to the same extent as the insured. (*Id.*, at pp. 664-665.)

In *McLaughlin* we were faced with a related issue that arises in the context of an insured's assignment to a third party claimant of his or her common law bad faith claim against the insurer. As with the direct statutory action, a judgment against the insured (or payment by the insured in settlement of a claim) has been held to be a precondition to the insured's right to transfer the bad faith action. (*Smith* v. *State Farm Mut. Auto Ins. Co.* (1992) 5 Cal.App.4th 1104, 1114 [7 Cal.Rptr.2d 131].) We went on to determine that the stipulated judgments, which were combined with covenants not to execute and signed only by the insured directors and officers and the claimant-investors, would support assignment of the insureds' claims against National Union to the investors. Evaluating the facts and circumstances of the case, we concluded the *McLaughlin* plaintiffs could legitimately proceed against National Union as assignees of the insured tortfeasors. (*McLaughlin, supra,* 23 Cal.App.4th at p. 1154; but see *Smith* v. *State Farm Mut. Auto Ins. Co., supra,* 5 Cal.App.4th at p. 1114.)

First, while liability was stipulated, rather than adjudicated, the amount of damages was not. The procedure for determining economic losses "obviated the collusive possibility of stipulated, sky-high damages that bear no relation to the injured claimant's harm." (*McLaughlin, supra,* 23 Cal.App.4th at p. 1155.)

Second, the judgments were entered after the court denied summary judgment motions of the settling outside directors. While denial of summary judgment did not render these directors liable, "at least there were triable issues of fact as to liability" and it could not be said that the directors were remiss in admitting "that there was a 'substantial risk' of 'being found by a jury to be liable to Plaintiffs with respect to claims by Plaintiffs for breach of fiduciary duty and negligent misrepresentation. . . ." (*McLaughlin, supra,* 23 Cal.App.4th at p. 1155.)

Third, while the covenant not to execute eliminated personal financial exposure for the judgments, the personal judgments still stood and could

adversely affect the future credit and business dealings of the insureds. (*McLaughlin, supra*, 23 Cal.App.4th at p. 1155.)

Fourth, National Union had notice of the underlying litigation against the outside directors and knew they might stipulate to liability. Upon urging by outside directors that National Union participate and negotiate a settlement, National Union took the position that the former directors and officers "should not be required to proceed through a trial to adjudication." (*McLaughlin, supra*, 23 Cal.App.4th at p. 1155.)

Finally, National Union encouraged these same officers to enter stipulations of liability with protective covenants and therefore was estopped to attack the validity of the judgments.[6] (*McLaughlin, supra*, 23 Cal.App.4th at pp. 1155-1156.)

These same reasons validate the trial court's decision in this case to preclude National Union from presenting evidence on the underlying liability of its insureds to plaintiffs or otherwise attacking the stipulated judgments. These reasons also persuade us that the stipulated judgments are conclusive judicial determinations of liability for purposes of *Moradi-Shalal* and *C.S.A.A.* Estopping National Union from undermining the judgments serves the same purpose as the triparte stipulation in *C.S.A.A.*, namely, that of preventing the insurer from relitigating its insured's liability in the section 790.03(h) action. (*C.S.A.A., supra*, 50 Cal.3d at pp. 664-665.)

Having established plaintiffs' right to pursue their statutory claims, nonetheless, in accordance with *McLaughlin*, we reverse the judgment on the ninth cause of action for violation of section 790.03(h), together with the attendant emotional distress awards. (*McLaughlin, supra*, 23 Cal.App.4th at p. 1166.) Consistent with *McLaughlin*, any retrial under section 790.03(h)(2) or (13) would be inappropriate. (*McLaughlin, supra*, 23 Cal.App.4th at p. 1166.)

---

[6]We are aware that the stipulation which the outside directors actually executed differed from the proposed stipulation reviewed by National Union: The former provided that the judgments would have no collateral estoppel effect *except* in the insurance coverage litigation and the latter foreclosed *all* preclusion. As in *McLaughlin,* this nuance does not alter our view that National Union should be estopped. "The bottom line is that National Union did not want the outside directors to proceed to trial, it did not have a problem with a stipulation to liability for purposes of dividing up the amount of insurance proceeds, . . . and it did not have a problem with insulating the insureds from personal liability. . . ." (*McLaughlin, supra*, 23 Cal.App.4th at p. 1156, fn. 9.)

### III. Plaintiffs' Cross-appeal

On cross-appeal plaintiffs contend the trial court erred in dismissing their punitive damages claims and made numerous erroneous and prejudicial decisions during the jury trial on their mental, physical and emotional injuries. These issues are moot in light of our reversal of the direct cause of action against National Union for violation of section 790.03(h). This cause was the only hook on which to hang a claim for either emotional distress damages or punitive damages.

### IV. Guidance on Retrial

At oral argument the parties indicated they anticipated a retrial on the surviving causes and asked this court for guidance on the viability of the test case procedure should the coordination trial judge elect to use such a procedure.

■ This has been a coordinated proceeding. The purposes of coordination include promoting the efficient use of judicial resources. (Code Civ. Proc., § 404.1; *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 877, fn. 6 [2 Cal.Rptr.2d 79, 820 P.2d 181].) As a general matter the rules implementing our coordination statutes[7] vest the coordinating judge with flexible procedures and "whatever great breadth of discretion may be necessary and appropriate to ease the transition through the judicial system of the logjam of cases which gives rise to coordination. . . ." (*McGhan Medical Corp.* v. *Superior Court* (1992) 11 Cal.App.4th 804, 812 [14 Cal.Rptr.2d 264].) For example, rule 1541(b) mandates that the coordination trial judge "assume an active role in managing all steps of the pretrial, discovery and trial proceedings to expedite the just determination of the coordinated actions without delay. . . ." Consistent with this mandate, the coordination judge may "(3) order any issue or defense to be tried separately and prior to the trial of the remaining issues when it appears the disposition of any of the coordinated actions might thereby be expedited." (*Ibid.*)

Herein, the coordination trial judge implemented a test case procedure whereby the *McLaughlin* actions against National Union were tried first, to a jury. Next, the court instructed the *Abelson* jury at the beginning and close of trial that findings and conclusions from prior proceedings regarding National Union's obligations and duties "removed and eliminated" many issues that it

---

[7]California Rules of Court, rule 1501 et seq. All further references to rules are to the California Rules of Court.

"would otherwise be required to decide." Specifically, the court instructed that the following had been determined: (1) National Union was obligated to pay the net judgments that plaintiffs received against the officers and directors of Technical Equities in 1988; and (2) National Union, in responding to earlier lawsuits, violated section 790.03(h), citing the particular statutory violations.

The court then informed the jury that it was called on to decide whether (1) National Union's conduct, in violating the particular provisions of section 790.03, was a "legal cause of emotional distress damages to any of the plaintiffs" and (2) "the nature, extent and quality of the emotional distress, if any, suffered by each such plaintiff."

While we commend the coordination trial judge for his willingness to explore innovative approaches and his perseverance in shepherding the massive volume of Technical Equities litigation through the trial court, we perceive several problems with the particular test case approach used in the investor suits against National Union. The first concerns the offensive use of collateral estoppel, which occurs when a plaintiff seeks to prevent a defendant from relitigating an issue determined adversely to defendant in another action against plaintiff or another party. (*Estate of Gump* (1991) 1 Cal.App.4th 582, 608 [2 Cal.Rptr.2d 269].) ■ Collateral estoppel will bar unnecessary relitigation of issues under the following circumstances: (1) the issue previously decided must be identical to the one sought to be relitigated; (2) the party to be estopped must have been a party or privy of a party in the prior suit; and (3) that suit must have resulted in a final judgment on the merits. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 910 [226 Cal.Rptr. 558, 718 P.2d 920].)

The liability verdicts in *McLaughlin*, on the assigned causes of action as well as the statutory cause, were bootstrapped into *Abelson* under a collateral estoppel concept while the *McLaughlin* judgment was on appeal. ■ But according to California law, a judgment is not final for purposes of collateral estoppel while open to direct attack, e.g., by appeal. (*National Union Fire Ins. Co.* v. *Stites Prof. Law Corp.* (1991) 235 Cal.App.3d 1718, 1726; [1 Cal.Rptr.2d 570]; *Long Beach Unified Sch. Dist.* v. *State of California* (1990) 225 Cal.App.3d 155, 169 [275 Cal.Rptr. 449]; *Sandoval* v. *Superior Court* (1983) 140 Cal.App.3d 932, 936-937 [190 Cal.Rptr. 29].)

In deciding not to retry National Union's liability in the *Abelson* proceeding, the court interpreted the coordination rules as allowing a "limited purpose" collateral estoppel order. Its rationale pertained to a "special

factor" in the coordinated action, namely the age of plaintiffs. Since the inception of the Technical Equities coordinated proceeding, 22 elderly plaintiffs had died. The many remaining elderly plaintiffs in related cases had moved for trial-setting preference under Code of Civil Procedure section 36, subdivision (a), which requires the court to grant the preference to parties over the age of 70 who have a "substantial interest in the action as a whole" and whose health is such that a preference is necessary to avoid prejudicing that interest.

The trial court reasoned that the elderly plaintiffs' rights under Code of Civil Procedure, section 36, subdivision (a), might undermine the coordination rules and statutes, which allow the coordination judge to fashion schedules and procedures that do not precisely follow established procedure because of the unique nature of a coordinated proceeding.[8] If the trial court were to wait until *McLaughlin* became final, additional elderly plaintiffs probably would die. Unless the court granted limited purpose issue preclusion, it feared that the remaining elderly plaintiffs, rightfully entitled to preferential trial setting, would immediately go to trial, resulting in many more trials and appeals. This potential proliferation of individual suits in turn would defeat the purposes of coordination.

To avert this dilemma in the first place, consideration should have been given to adding the elderly investors to the *McLaughlin* test case plaintiffs' group. Short of that, the question becomes whether the goal of streamlining coordinated litigation to enhance judicial efficiency and economy could ever justify modifying the final judgment requirement of the California doctrine of collateral estoppel. We are not prepared to say that a "limited purpose"

---

[8]To spell out this analysis:

Code of Civil Procedure section 404.7 states: "Notwithstanding any other provision of law, the Judicial Council shall provide by rule the practice and procedure for coordination of civil actions in convenient courts, including provision for giving notice and presenting evidence."

Pursuant to this mandate, the Judicial Council adopted the coordination rules. Rule 1504 provides: "(a) Except as otherwise provided in these rules, all provisions of law applicable to civil actions generally apply regardless of nomenclature to an action included in a coordination proceeding if they would otherwise apply to such action without reference to this rule. To the extent that these rules conflict with such provisions, these rules shall prevail as provided by section 404.7 of the Code of Civil Procedure. [¶] (b) If the manner of proceeding is not prescribed by Chapter 2 (commencing with Section 404) of Title 4 of Part 2 of the Code of Civil Procedure or by these rules, or if the prescribed manner of proceeding cannot, with reasonable diligence, be followed in a particular coordination proceeding, the assigned judge may prescribe any suitable manner of proceeding that appears most conformable to such statutes and rules."

Finally, rule 1541(a)(4) permits the coordination trial judge to "provide a method and schedule for the submission of preliminary legal questions that might serve to expedite the disposition of the coordinated actions; . . ."

collateral estoppel order would never be appropriate. However, at a minimum, careful regard would have to be given to how firm a foundation would undergird such an order. In hindsight, we know *Abelson* stood on a house of cards that has collapsed substantially with the *Chatton, Helfand* and *McLaughlin* reversals. But it did not take hindsight to know that appeals had been launched, and would be vigorously pursued, in all three cases forming the underpinnings of *Abelson.* A reversal in any one of those cases would have compelled reversal of *Abelson.* Those were not good odds under which to fashion a limited purpose collateral estoppel order.

Of course the odds will change on retrial because *Chatton, Helfand* and *McLaughlin* are final and the second round of investor litigation against National Union will present dramatically narrower issues. And it goes without saying that plaintiffs are getting older, not younger. However, regardless of whether the new situation would be a candidate for experimenting with a less stringent final judgment concept, other considerations militate against endorsing a replay of the *McLaughlin-Abelson* test case procedure to foreclose relitigation of National Union's liability. While judgments for economic damages on the surviving assigned cause of action for wrongful cancellation could be computed and entered for all plaintiffs if liability and formulaic damages were found in an initial test case, the same cannot be said for the surviving statutory cause of action.

This is because, under the test case procedure described above, the court instructed the *Abelson* jury solely on ultimate findings of fact with regard to National Union's section 790.03(h) violations, as established by the *McLaughlin* jury. ▮ "Damages for emotional distress are inextricably related to the conduct causing that distress. . . . [¶] . . . The amount and severity of damages for emotional distress is a question of fact for the jury to decide based on all the evidence before it. This obviously includes conduct of the defendant." (*Kardly* v. *State Farm Mut. Auto. Ins. Co.* (1989) 207 Cal.App.3d 479, 484 [255 Cal.Rptr. 40].) To assess a plaintiff's emotional trauma, the jury thus must hear all the evidence regarding the defendant's purported behavior that caused the trauma. The distilled adjudication of liability delivered to the *Abelson* jury was an insufficient basis to evaluate the propriety or amount of emotional distress damages. Moreover, these verdicts were tainted by virtue of the fact that erroneous instructions swept in four—not two—statutory violations and informed the jury that National Union's policies provided $31 million in coverage.[9] It is impossible to predict if a jury would attribute any, let alone the same amount of damages, on proper instructions for only two violations.

---

[9]In fact, coverage was $20 million less defense costs. (*Chatton* v. *National Union Fire Ins. Co., supra,* 10 Cal.App.4th 846; *Helfand* v. *National Union Fire Ins. Co., supra,* 10 Cal.App.4th 869.)

■ Similarly, punitive damages are not "recoverable in the abstract" and "must be tied to oppression, fraud or malice *in the conduct which gave rise to liability in the case.*" (*Medo* v. *Superior Court* (1988) 205 Cal.App.3d 64, 68 [251 Cal.Rptr. 924], italics in original.) Therefore the same jury must determine both liability and punitive damages. (*Ibid.*; Civ. Code, § 3295, subd. (d).) Any trial or retrial of punitive damages in these coordinated proceedings must comply with *Medo*.

## V. Disposition

The judgment is reversed in accordance with this opinion and our opinions in *Chatton*, *Helfand* and *McLaughlin*. Plaintiffs to pay costs on appeal.

Reardon, J., and Perley, J., concurred.