[No. C063603. Third Dist. Aug. 22, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
DWAYNE BRIAN BURNS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, and IV.

## Counsel

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Brook Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NICHOLSON, J.**—Defendant Dwayne Brian Burns went into someone else's home at around 4:00 in the morning looking for a woman with whom he had a "quasi-romantic" and "quasi-sexual" relationship. When he found her in the bed of one of the residents of the home, he pepper sprayed two of the residents. Convicted, after two trials, of misdemeanor carrying a loaded firearm and misdemeanor aggravated trespassing (in the first trial) and felony use of tear gas (in the second trial), and sentenced to two years in state prison, defendant appeals.

On appeal, defendant contends that (1) the trial court erred by instructing the jury in the second trial that trespassers have no right to self-defense; (2) the court erred by failing to instruct the jury in the first trial on self-defense as a defense to trespassing and on unanimity; (3) the court erred by instructing the jury in the second trial that defendant committed aggravated trespassing, thus invoking collateral estoppel against defendant; and (4) the prosecutor committed misconduct. We conclude that the trial court erred by applying collateral estoppel but that the error was harmless. In all other respects, there was no error or misconduct.

We affirm.

### PROCEDURE

Defendant was charged with felony criminal threats (count 1; Pen. Code, § 422); felony use of tear gas not in self-defense (count 2; Pen. Code, § 12403.7, subd. (g)); misdemeanor carrying a loaded firearm (count 3; Pen. Code, § 12031, subd. (a)(1)); misdemeanor exhibiting a firearm (count 4; Pen. Code, § 417, subd. (a)(2)); and misdemeanor aggravated trespassing (count 5; Pen. Code, § 602.5, subd. (b)).

Defendant was tried by jury (first trial; Judge Stephen H. Baker, presiding), which convicted him of misdemeanor carrying a loaded firearm and misdemeanor aggravated trespassing but acquitted him of felony criminal threats and misdemeanor exhibiting a firearm. The jury deadlocked on the felony count of using tear gas not in self-defense, ultimately voting seven to five in favor of acquittal. The trial court declared a mistrial as to that count.

Defendant was retried by jury (second trial; Judge Cara Beatty, presiding) on the felony count of using tear gas not in self-defense. The jury convicted defendant on that count.

The trial court (Judge Beatty, presiding) denied probation and sentenced defendant to the middle term of two years in state prison on the felony tear gas count. The court also imposed concurrent one-year terms for the two misdemeanors—carrying a loaded firearm and aggravated trespassing.

## FACTS

The parties agree that the evidence presented in the two trials was similar. For this reason and because defendant makes no assertions concerning the sufficiency of the evidence in either trial, we present the facts without indicating what evidence was produced in each trial, except where noted.

On the evening of May 4, 2007, defendant, who was 42 years old, was at the home of sisters Kelly and Kathy Kelsay, drinking with them until about 10:00 p.m. Kelly, who was 41 years old, left the home in her mother's green van, and defendant went to his own home. In the first trial, defendant stated that he had romantic or sexual feelings toward Kelly. In the second trial, defendant described his relationship with Kelly as "quasi-romantic" and "quasi-sexual."

Early the next morning, defendant, who had been drinking at home, received a call from Kathy, who stated that Kelly had not returned. Defendant left his home around 3:30 or 4:00 a.m. to look for Kelly. He first went to the home of Kelly's mother but did not find the green van there, and then went to the residence of Jeffrey Kelsay, the nephew of Kelly and Kathy, where he found the van. Defendant testified that he knew where Jeffrey lived because he had taken Kelly there several times.

Jeffrey, who was in his early 20's, lived with two other young men of about the same age—Christopher Martinez and Shane Fotovat. When defendant arrived at the residence, Kelly was sleeping with Martinez in his room. Defendant claimed he was concerned for Kelly's welfare and the thought that she might be with another man, in his words, "did cross [his] mind."

Defendant pounded on the front door, waking up Jeffrey. When Jeffrey opened the front door, defendant entered the house and began frantically looking around. Jeffrey did not know defendant and did not invite him in. Defendant opened doors, saying Kelly's family was looking for her and that she was "coming with [him]." Martinez heard the commotion and told Kelly to hide.

Jeffrey called his grandmother, Kelly's mother, to ask whether the family was looking for Kelly, as defendant continued opening doors and saying that he was looking for Kelly. Jeffrey told defendant not to open Martinez's door because it would make Martinez mad, but defendant pushed on Martinez's door, trying to open it. Martinez was at the door and opened it slightly to ask, "Who are you?" and say, "Get out of my room." As soon as Martinez said that, Jeffrey told defendant to leave.

Defendant, screaming and yelling and saying Kelly was coming with him, continued to try to get into Martinez's room. So Martinez pushed back and, several times, told defendant to leave. Jeffrey hung up the phone and went to help Martinez.

Defendant took a pepper spray can from his pocket and sprayed Martinez and Jeffrey.

Considering defendant's appellate contentions, we summarize only briefly what happened after defendant pepper sprayed Martinez and Jeffrey.

Martinez picked up a bamboo chair and threw it at defendant, and Martinez and Jeffrey rushed defendant. Hearing the commotion, the other housemate, Fotovat, came out of his room, and the three housemates overpowered defendant, taking him outside and continuing to struggle with him. After defendant was pushed out into the street, he threatened to go get his gun, so the housemates went inside. When a Redding Police Department officer arrived, defendant was standing next to his vehicle. A loaded shotgun was in his vehicle.

Defendant testified that he and Jeffrey had met before the May 5, 2007, incident. When he saw the van Kelly had been driving, he wanted to make sure she was okay. Jeffrey invited him into the house by making a sweeping motion with his arm. Defendant became concerned about Kelly when Jeffrey did not answer his questions about where she was, so he began looking around for her. Martinez opened the door, and defendant inquired whether he had. seen Kelly. He said he had not and closed the door. Still more concerned about Kelly because of the response, defendant continued to look for her in the house. Suspicious of Martinez, defendant knocked on his door again and then heard Kelly say, "[W]ho is it?" and saw her naked in bed. Martinez began swearing at defendant and asking who he was and then started swinging at defendant and pushing him. Neither Jeffrey nor Martinez had asked defendant to leave. Both Martinez and Jeffrey started swinging at defendant, so defendant took the pepper spray from his belt and sprayed them.

## DISCUSSION

## I, II[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### *Collateral Estoppel (Second Trial)*

Defendant contends that his conviction for using pepper spray, obtained in the second trial, must be reversed because the trial court instructed the jury, based on collateral estoppel, that defendant was convicted of aggravated trespassing in the first trial. He claims this application of collateral estoppel was improper. We conclude the court erred, but that the error was harmless.

■ Collateral estoppel prevents relitigation of claims or issues litigated to final judgment in a prior action. (*People v. Barragan* (2004) 32 Cal.4th 236, 252–253 [9 Cal.Rptr.3d 76, 83 P.3d 480].) The prerequisites to applying collateral estoppel are " '(1) [a] claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding. [Citations.]' [Citation.]" (*Id.* at p. 253.) The final judgment prerequisite requires that the time for seeking a new trial or appealing the judgment has expired and any appeal is final. In other words, the judgment is not final and preclusive if it is still subject to direct attack. (*People v. Summersville* (1995) 34 Cal.App.4th 1062, 1067–1068 [40 Cal.Rptr.2d 683]; *Abelson v. National Union Fire Ins. Co.* (1994) 28 Cal.App.4th 776, 787 [35 Cal.Rptr.2d 13].)

Whether collateral estoppel may be used offensively by the prosecution in a criminal action has been debated for many years. (Note, *Ninth Circuit Reversal: The Removal of Offensive Collateral Estoppel in Alienage Proceedings* (Apr. 2008) 16 Wm. & Mary Bill Rts. J. 1279.) In general, such offensive use of collateral estoppel has been limited to alienage and evidence suppression issues. For example, a person who is adjudicated as a noncitizen of the United States and deported may not in a subsequent proceeding challenge the prior adjudication that he is not a citizen. (See *U.S. v. Rangel-Perez* (1959) 179 F.Supp. 619, 622–629.)

■ It is notable that neither alienage nor evidence suppression determinations traditionally give rise to jury trial rights. The determinations are made

---

[*]See footnote, *ante*, page 726.

by the court. (Note, *Precluding the Accused: Offensive Collateral Estoppel in Criminal Cases* (Sept. 1994) 80 Va. L.Rev. 1379, 1383–1384.)

Recently, the Ninth Circuit of the United States Court of Appeals has retrenched from offensive use of collateral estoppel in alienage determinations. (*U.S. v. Smith-Baltiher* (9th Cir. 2005) 424 F.3d 913, 921 (*Smith-Baltiher*).) The court reasoned that, because alienage is an element of the offense, the defendant has a right to a jury determination on that element, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466, 476–477 [147 L.Ed.2d 435, 447, 120 S.Ct. 2348]. (*Smith-Baltiher, supra*, at p. 921; see also *Gutierrez v. Superior Court* (1994) 24 Cal.App.4th 153, 169–170 [29 Cal.Rptr.2d 376] [prohibiting use of collateral estoppel to prevent defendant from contesting matter of identity in murder trial after conviction for attempted murder based on same incident].)

While the general rule limits offensive use of collateral estoppel in criminal prosecutions to cases involving alienage and evidence suppression, at most, one California Supreme Court case stepped beyond that limitation. In 1966, the court held that in a felony-murder retrial it was proper for the trial court to instruct the jury that, during the first trial, the defendant had been convicted of the predicate felonies (burglary and robbery). (*People v. Ford* (1966) 65 Cal.2d 41, 50–51 [52 Cal.Rptr. 228, 416 P.2d 132] (*Ford*), overruled on another ground in *People v. Satchell* (1971) 6 Cal.3d 28, 34–41 [98 Cal.Rptr. 33, 489 P.2d 1361].) The critical difference between *Ford* and this case, however, is that, in *Ford*, an appeal intervened between the first and second trials. Therefore, the burglary and robbery convictions had been affirmed on appeal when they were used offensively by the prosecution in the second trial. (*Id.* at pp. 44–46.)

The *Ford* court stated: "The doctrine of res judicata applies to criminal as well as civil proceedings and operates to conclude those matters in issue which the verdict determined though the offenses be different. (*Sealfon* v. *United States*, 332 U.S. 575, 578 [92 L.Ed. 180, 68 S.Ct. 237]; see *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.*, 58 Cal.2d 601, 606 [25 Cal.Rptr. 559, 375 P.2d 439].) Thus where a defendant is tried on multiple counts of a single information, each count being considered as a separate and distinct offense, the doctrine of res judicata operates to preclude the relitigation of issues finally determined upon retrial of only one count. (See *People* v. *Beltran*, 94 Cal.App.2d 197, 205 [210 P.2d 238], and cases cited and discussed therein.) It follows that the doctrine of res judicata justifies instructions, where relevant, that a defendant has been found guilty of crimes *finally adjudicated* which are charged as elements in another charge or charges then in the process of being retried. Accordingly, it was not error for the trial court to give appropriate instructions that defendant had been convicted of the various felonies . . . ." (*Ford, supra*, 65 Cal.2d at pp. 50–51, italics added.)

Citing *Ford*, the Attorney General urges us to approve the trial court's reliance on collateral estoppel in instructing the jury that defendant committed aggravated trespassing. However, even assuming *Ford* is good law on the subject of offensive use of collateral estoppel, one of the essential prerequisites for applying collateral estoppel was absent here. There had been no final adjudication of the aggravated trespassing count. Although defendant was found guilty by the jury, he retained his right to appeal the final judgment, including that finding.[2]

■ While there have been cases, most notably *Ford*, and commentary encouraging the offensive use of collateral estoppel in criminal prosecutions, no case or commentary that we have found has gone so far as to encourage such use when there has been no final judgment on the verdict to which collateral estoppel is to be applied. Deferring to defendant's right to trial by jury, we see no reason to extend the use of collateral estoppel to give preclusive effect to a factual determination made by a jury but still open to direct attack on appeal. Therefore, the trial court erred by instructing the jury that defendant committed aggravated trespassing.[3]

---

[2] In a petition for rehearing, the Attorney General scolds this court for questioning the continued vitality of *Ford* and lectures us that we are bound by *Ford* because it has not been, in the Attorney General's words, "clearly superseded." (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) This diatribe fails to recognize that we distinguish *Ford*; we do not refuse to follow it. Furthermore, we may be bound, but we are not gagged. (*People v. Hart* (1999) 74 Cal.App.4th 479, 487 [86 Cal.Rptr.2d 762].)

[3] The Attorney General worries in the petition for rehearing that our conclusion concerning collateral estoppel will interfere in other situations when a defendant has been convicted but must be retried on associated enhancement allegations—for example, when the jury convicted on the substantive offense but deadlocked on an enhancement allegation.

The Attorney General "imagine[s] the situation where a defendant is charged with robbery and personal use of a firearm. He defends himself at trial by presenting an alibi defense and arguing that the gun used in the robbery was a toy. The jury convicts him of robbery and deadlocks on the gun use enhancement. Under the Court's reasoning, not only would the prosecution have to reprove the robbery on the retrial of the enhancement, but the defendant would be able to defend himself on the enhancement by again arguing that he was not the robber."

To the contrary, the California Supreme Court, in the indistinguishable analog of death penalty prosecutions, has held that " 'a trial court may receive a guilty verdict from a jury that is unable to agree on a penalty provision, declare a mistrial on the penalty provision alone, and empanel another jury to consider the issue of penalty. [Citations.]' [Citation.]" (*People v. Anderson* (2009) 47 Cal.4th 92, 119–120 [97 Cal.Rptr.3d 77, 211 P.3d 584].) Nothing in our decision prevents the trial court from retrying an enhancement provision and instructing the jury that the defendant has already been convicted of the substantive offense.

The Attorney General misconstrues our decision. We do not hold that a jury can never be apprised of an earlier conviction that has not become final. That question is well beyond the scope of the issues raised and argued by the parties in their briefing. We hold only that, under the circumstances of this case, collateral estoppel did not justify instructing the jury that defendant, at some point, was a trespasser.

This does not end the matter, however, because we cannot reverse unless the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) Defendant urges us to find that the instruction concerning aggravated trespassing prevented the jury from deciding an element of the offense and was structural error, reversible per se and not subject to harmless error analysis, citing *Sullivan v. Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078]. We disagree. The instruction did not prevent the jury from deciding on each element of the offense. (See *People v. Gamache* (2010) 48 Cal.4th 347, 396 [106 Cal.Rptr.3d 771, 227 P.3d 342] [structural errors go to the very construction of the trial mechanism, such as the failure of a jury to reach any verdict on an essential element].) Indeed, defendant identifies no specific element of unlawful use of tear gas that was not necessarily decided by the jury. Accordingly, since the jury was misinstructed, we must determine whether it is "reasonably probable a verdict more favorable to defendant would have resulted had the instruction not been given." (*People v. Crandell* (1988) 46 Cal.3d 833, 870 [251 Cal.Rptr. 227, 760 P.2d 423], overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365 [121 Cal.Rptr.2d 580, 48 P.3d 1136].)

Defendant's argument that the error was prejudicial is meager at best. Aside from arguing that the error was structural, defendant states: "[The error] certainly determined the outcome of [defendant's] case, and met any standard for reversal however stringent. It cannot be deemed harmless in any sense of the word." To the contrary, it is unlikely that the error in instructing the jury that defendant committed aggravated trespassing had any effect on the verdict in the second trial.

Despite defendant's agitation concerning the instruction that he committed aggravated trespassing, the jury was fully apprised of the elements of unlawful use of tear gas. While the special instruction informed the jury that defendant committed aggravated trespassing, it left to the jury the determination of whether, when defendant used the pepper spray, he was trespassing. As the trial court noted in denying a motion for new trial on this issue, the instruction "provided the jury with the ability to basically determine that [defendant] was not a trespasser at the time that he used the pepper spray; [therefore] he had all . . . the defenses available to him had he not been a trespasser."

Specifically with respect to defendant's claim of self-defense, the instruction did not misinstruct the jury on defendant's right to use force. It stated that he could use reasonable force to defend himself if the residents used unreasonable force against him. That is, in a nutshell, the law of self-defense.

(See CALCRIM No. 3470 [defendant must use no more force than reasonably necessary].) In fact, the trial court gave the full pattern instruction on self-defense. There was no dispute that defendant used the pepper spray, only whether he did so in self-defense. The jury therefore necessarily concluded that defendant used unreasonable force.

Furthermore, it is unlikely on the facts that a jury would find that defendant's use of the pepper spray was reasonable. He was inside the residence at an unreasonable hour. He was apparently obsessed with finding Kelly. He had armed himself with pepper spray, and with a loaded firearm just outside in his vehicle. He was the aggressor. The weight of the evidence was that, at the moment defendant used the pepper spray, he had no right to do so rather than leave the residence.

The judge who presided over the second trial described the facts of this case from her point of view at sentencing: "I see these young folks that are awakened from their sleep, hearing somebody pounding on their front door; and according to our first victim, some guy comes into my home, I've never met him before, he's frantically roaming from room to room screaming, appearing angry, I had to grab him to get him out of my house, he had no permission, no reason, no right. [¶] . . . [¶] And then there's the struggle in the home. He wasn't going to leave. [Defendant] was not going to leave. . . . [¶] . . . [¶] As to his participation in the crime, he was the one that instigated the entry into the home, his claim being that he had been phoned. I don't believe that for a minute. I believe that he had most likely been scouting the neighborhood, seen the van in the yard and discovered that his then-girlfriend was present in the home and decided that he was going to enter the home and do whatever he needed to do to get her out of there."

It is not reasonably probable a verdict more favorable to defendant would have resulted had the aggravated trespassing instruction not been given. As a result, the instructional error was harmless.

IV

*Alleged Prosecutorial Misconduct (Both Trials)**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 726.

## DISPOSITION

The judgment is affirmed.

Raye, P. J., and Hull, J., concurred.

A petition for a rehearing was denied September 13, 2011, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 30, 2011, S196873.