Filed 12/27/13  P. v. Flynn CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GIRARD FLYNN,<br><br>    Defendant and Appellant. | B243277<br><br>(Los Angeles County<br> Super. Ct. No. TA121468) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Walton, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Girard Flynn appeals from the judgment entered following his conviction by jury on one count of first degree murder. (Pen. Code, § 187, subd. (a).)[1] Appellant contends that the evidence is insufficient to sustain the conviction, and that the trial court erred in instructing the jury that flight may indicate consciousness of guilt. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

William Payne lived on 113th Street in the City of Los Angeles, across the street from appellant. On January 3, 2012, around 6:00 a.m., appellant called Payne and asked him to take him for a ride, although he did not specify where he wanted to go. Appellant then walked to Payne's house and asked if he could stay at Payne's house while Payne went to a haircut at 9:30 that morning. Payne refused and instead took appellant with him to his haircut appointment. Appellant appeared to be high, and he seemed nervous.

While Payne was driving them home from his haircut, appellant made a phone call to his mother and said, "Mom, I killed Junior." Appellant's brother, Calvin Milner, was known as "Junior." Appellant was screaming and in tears. Appellant said he was going to turn himself in to the police.

Payne started driving to appellant's house, but when they arrived they saw police cars and an ambulance. Appellant wanted to get something to eat before turning himself in, so Payne drove him to Burger King and then returned to appellant's house, where appellant surrendered to the police.

---

[1] All further statutory references are to the Penal Code.

That same morning, around 10:48 a.m., Los Angeles Police Department Officer Jaime Zarate and his partner, Officer Lozano, responded to a radio call about a possible murder victim at a house on 113th Street in the City of Los Angeles. When they arrived, all the doors and windows of the residence were locked and no one responded to their knocks on the door, so Officer Lozano kicked in the front door. When they entered the house, they found the victim dead on the bedroom floor.

Around 11:30 a.m. that day, Detective Sonny Patsenhann was driving on 113th Street when he heard appellant yell, "hey" from the passenger seat of a car. Detective Patsenhann asked appellant if he was all right, and appellant started crying. Appellant continued crying and told Detective Patsenhann he killed his brother, gesturing to the police car and ambulance in front of his house.

Appellant was taken into custody by Officer Carlos Gonzalez and his partner. Appellant continued crying and apologizing, saying he was sorry. Appellant told the officers he had a knife. Officer Gonzalez searched appellant and found a knife and a screwdriver.

Detectives Jorge Gutierrez and Scott Teubert interviewed appellant and recorded the interview. Detective Gutierrez noted that appellant did not appear to have any recent wounds on his body or hands.

The video recording of appellant's interview was played for the jury at trial. Appellant appeared high during the interview. He spoke freely about what happened, rambling and crying.

Detective Roberto Bourbois interviewed several witnesses, including appellant's mother, Bernice Flynn. Flynn told Detective Bourbois that appellant called her on December 31, 2011, and said, "Mama, Junior is laid out. I don't

3

think he [is] breathing." Flynn told appellant to call an ambulance, but he said he did not want to call the ambulance and asked her to do it.

Los Angeles Police Department criminalists Elizabeth Swanson and Annette Woiwode examined the crime scene for potential evidence. Swanson found blood stains, a broken mop handle, a broken mug, glass shards, a broken chair, and an ashtray in the kitchen, dining room, and den. She also found possible drag marks on the den floor.

Swanson found broken pieces of a chair, blood stains, a broken mop, a six-inch long knife blade, and a broken knife handle in the bedroom where Milner was found. Milner's body was wrapped in a blanket, and there was a cord wrapped around his ankle. Swanson found a blood-stained iron near an overturned cabinet. Blood stains were found on appellant's shoes and clothing.

The autopsy of Milner showed multiple lacerations, bruises and swelling on his face, a broken nose, and a split lip. The coroner opined that the injuries were caused by blunt force trauma. There were contusions on his upper body and wounds from a sharp object such as a knife on the right side of his lower back and on his left shoulder. The coroner stated that there were multiple bruises and abrasions on the right arm, right chest and shoulder area caused by blunt force trauma. There were sharp force trauma wounds on the back of the forearm from Milner's attempts to defend himself. Milner also had numerous contusions on the left side of his body from blunt force trauma. The coroner testified that there were also injuries to Milner's legs, such as blunt force trauma to the right leg and a fracture and sharp force trauma in the left leg. The coroner conducted a toxicology test and found no alcohol or drugs in Milner's blood.

An internal examination by the coroner revealed "large soft tissue hemorrhages" in Milner's head due to blunt force trauma, blood and blood clots in

4

the brain, and blood in the intestines and stomach. The coroner opined that the immediate cause of death was a subdural hematoma in the brain due to blunt force trauma, stating that the amount of blood found in the head was "immediately fatal." The coroner estimated that the time of death was 21 hours before 12:19 a.m. on January 4, or 3:19 a.m. on January 3.

*Defense Evidence*

Appellant testified on his own behalf. He explained that was completely blind in his left eye. He had been addicted to cocaine for about 26 years and was high at the time of the incident.

Appellant stated that, on December 31, 2011, he was living in the house on 113th Street with Milner and a woman named Rochelle Gray. Appellant wanted to get high, so he went to his brother's room and asked him for some "brillo," which appellant described as something to put into a glass pipe to smoke crack cocaine. Milner gave appellant some brillo, but appellant said it was the wrong kind. Milner told appellant, "Give me some of that shit," but appellant replied, "No, . . . because you said you quit smoking." Milner then looked at a butcher knife sitting on his dresser. Appellant saw Milner look at the knife and decided he needed to leave the room.

As appellant started to open the door to leave Milner's bedroom, he looked back and saw Milner about 12 inches away from him, holding the knife. Appellant's hand hit the knife, and the blade broke off the handle. Appellant thought Milner was going to stab him, so he grabbed Milner's hand. Milner leaned down to pick the knife up, and appellant started kicking him.

Appellant stopped because he realized he was kicking Milner too much. When Milner stood up, appellant saw that he had badly hurt Milner in the mouth.

5

Milner looked at the knife again, and appellant said, "Bro, come on bro." When Milner tried to pick the knife up, appellant kicked him in the head about four times. Appellant then said, "I quit. I'm cool. That's it bro, no more."

Milner stood up again, got the blade and tried to put the blade back on the handle. He was "wobbly" because of being kicked in the head. Appellant told Milner, "Bro, you want me to kill you, don't you?" He continued, "You're my bro. I ain't going to kill you. Just give me the knife." Appellant took the knife from Milner and threw it against the wall.

Appellant did not know what to do, so he called his mother. Milner was standing up, "wiping blood all over everything." Appellant's mother told him to call an ambulance. Appellant asked Milner if he needed paramedics, and Milner said no, so appellant did not call an ambulance. Appellant put the phone to Milner's mouth so his mother could hear him say he did not need an ambulance. His mother told him to watch Milner and hung up. Milner lay on his back, and appellant said that it sounded as if Milner was choking on the blood in his mouth, so appellant turned him onto his side. Milner kept turning onto his back, but appellant tried to place him on his side so he would not "drown[] in the blood."

Appellant stayed with Milner about two hours, eventually falling asleep for a few hours. When he awoke, he decided to tie Milner up so that Milner could not get up and hurt him. He reasoned that Milner had been strong enough to stand while appellant was on the phone with his mother and that Milner had fought being turned on his side, so he still feared for his safety. Appellant got an old telephone cord and tied one of Milner's legs, but he changed his mind. Instead, he took a stick from a kitchen chair and tried to break Milner's foot so that Milner could not get up and hurt him if he fell asleep.

Appellant heard Gray return to the house, so he gave her some money while she was at the back door before she could come inside. Appellant went to check on Milner and discovered he was dead.

Appellant went into shock, covered Milner, and walked out of the room without touching anything. He waited for Gray to return with some drugs. Appellant testified, "I smoked dope 24 hours while he was in there dead and I was in there getting high trying to act like didn't nothing happen." He said that the fight was on January 1, he noticed Milner was dead on January 2, and on January 3, he called his mother. He explained that he called his mother because "it was over this time. It's time for me to come to jail or it was time for her to know." He stated, "I wasn't ever going to run. . . . I'm going to face it, come on in, do what I'm supposed to do."

Appellant called his mother and told her that he killed Milner. He was screaming on the phone, asking her what to do. He asked her to call the police and tell them he would meet them at the house.

Appellant testified that he loved his brother and was not trying to kill him, but he was afraid Milner was going to kill him with the knife. Appellant explained that he was particularly afraid because he had been stabbed 32 years earlier and had a strong reaction to knives. When appellant saw the knife, he was determined not to let Milner stab him.

When the detectives asked appellant for a motive, appellant told them, "I really wanted to break some shit that maybe he'll really just mind me. . . . [¶] I just going to fuck up him bad then he going to do what I say because bad [*sic*], I don't understand." The detectives asked, "Why did you want to fuck him up?" Appellant replied, "Because he was not doing [*sic*] and letting mother fuckers in the house, my foot he was not [*sic*]."

7

Appellant testified that he was "mad because [Milner] wouldn't stop trying to get that knife, that blade. I was mad because he would not – usually, you hit a person and they go knock out. And they knock out. They stop moving. . . . [¶] He just keep trying to pick up that blade. That's why I was mad. I was mad because he would not go out and I was mad because he would not stop trying to pick up that blade." When asked about the blood and broken glass in the kitchen area, appellant stated that he did not know anything about it.

Appellant told the detectives that he got along with Milner but did not like that Milner was dirty and made appellant's clothes smell when he borrowed them. He also said that Milner used to stand behind appellant on his blind side, which he knew angered appellant.

Dr. Kevin Booker, a neuropsychologist specializing in adult trauma and human decision making, testified about posttraumatic stress disorder, an anxiety disorder after someone has been subjected to a life-threatening or traumatic experience. One symptom is hypervigilance, in which a person has an extreme concern about protecting himself because his prior trauma caused him to believe he could be injured at any time. Dr. Booker examined appellant and learned that he was stabbed by a neighbor when he was 20 years old, resulting in three to four weeks of recovery following emergency medical care. Dr. Booker testified that appellant suffered from hypervigilance to knives, nightmares, intrusive daydreams, and avoidance behavior as a result of this trauma. He also testified that appellant's cocaine use increased his hypervigilance.

*Procedural Background*

Appellant was charged in an amended information with one count of murder. (§ 187, subd. (a).) Following a jury trial, appellant was found guilty of

8

first degree murder. Appellant was sentenced to 25 years to life in prison. Appellant filed a timely notice of appeal.

## DISCUSSION

Appellant contends that the evidence is insufficient to sustain the finding of first degree murder and that his conviction should have been for second degree murder instead. He also contends that the trial court erred in instructing the jury that flight may indicate consciousness of guilt. We disagree with both contentions.

I.    *Sufficiency of the Evidence*

Appellant was prosecuted for first degree murder under two different theories: (1) the murder was willful, deliberate, and premeditated; and (2) the murder was committed by torture. (§ 189.) He contends that the evidence is insufficient to support the verdict under either theory.

"The law we apply in assessing a claim of sufficiency of the evidence is well established: '"""[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""' [Citation.] . . . 'We presume "'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." [Citation.]' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

*Willful, Deliberate and Premeditated Murder*

"A willful murder is an intentional murder, and malice is express when there is an intent to unlawfully kill a human being. [Citations.]" (*People v. Moon* (2005) 37 Cal.4th 1, 29.) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. [Citation.] However, the requisite reflection need not span a specific or extended period of time. ""'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .'"" [Citation.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 543 (*Stitely*).)

Although appellant testified that he did not intend to kill Milner, there was also evidence from which a reasonable jury could infer that the murder was intentional. For example, appellant told detectives, "I went to try and kill [Milner's] ass. I wanted to try to make his ass die. . . . [¶] I was trying to kill him. I wanted his ass dead." He also told detectives that Milner "didn't want me to go to rehab. He wanted me to kill him. . . . [¶] He grabbed that knife because he wanted me to kill him."

Not only do appellant's statements support the finding of first degree murder, but "[t]he manner of killing also suggests premeditation." (*Stitely*, *supra*, 35 Cal.4th at p. 544.) In *Stitely*, the court reasoned that evidence that the defendant applied lethal pressure to the victim's neck "for a 'long' time . . . suggest[ed] defendant had ample opportunity to consider the deadly consequences of his actions. [Citation.]" (*Ibid.*)

Similar to *Stitely*, appellant here committed numerous acts of lethal violence against Milner over an extended period of time. He kicked Milner repeatedly in the mouth and head, testifying that he "thought [he] could kick [Milner's] mouth off." He also stated that he was wearing shoes with a thick sole and "really was

kicking his lips off" and "might have kicked his tongue out his [*sic*] mouth." Appellant complained during his interview with the detectives that Milner "wouldn't die" and "kept putting blood all over the walls, blood everywhere." He also admitted hitting Milner with chair legs and a coffee cup.

Appellant told detectives that Milner was asking for help when appellant stopped beating him, and that appellant was glad that his mother heard Milner say that. Despite Milner's pleas for help, appellant did not call for an ambulance, stating that Milner told his mother he did not need the paramedics.

Appellant's prolonged beating of Milner, his failure to obtain help for Milner, and his other acts of violence after hearing Milner choking on his blood constitute substantial evidence to support a finding of willful, deliberate, and premeditated murder.

*Murder by Means of Torture*

There is also substantial evidence to support the prosecution's theory that appellant committed murder by means of torture. "'Torture murder is "murder committed with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain."' [Citation.] The culpable intent is one to cause pain for '"the purpose of revenge, extortion, persuasion or for any other sadistic purpose."' [Citations.] [¶] The intent to inflict extreme and prolonged pain may be inferred from the circumstances of the crime. [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 888.)

As discussed above, appellant repeatedly kicked Milner in the mouth and head while wearing shoes with thick soles, describing his actions as kicking Milner's lips off. Even after hearing Milner choking on his own blood, appellant used a telephone cord to tie up Milner's leg and part of a chair to break Milner's

11

foot. The coroner testified that there were 350 milliliters of blood in Milner's stomach and intestines, indicating that Milner was alive, bleeding profusely in his mouth and swallowing this blood for hours. A reasonable trier of fact could find an intent to inflict extreme and prolonged pain from the circumstances of appellant's brutal attack on Milner.

The verdict of first degree murder is supported by substantial evidence.

II.     *Jury Instruction Regarding Flight*

Appellant contends that he was deprived of his due process rights when the trial court instructed the jury that flight may indicate consciousness of guilt.

The prosecutor asked for a flight instruction on the basis that appellant went to Payne's house, asked if he could stay there, and went to the barber with Payne. Defense counsel objected to the instruction, arguing that appellant never tried to flee, called his mother to call the police, and flagged down the police when he saw them. The court did not think that appellant left the house to avoid arrest, pointing out that appellant stayed with his brother for 24 hours and stayed longer than that after realizing his brother was dead. The court also pointed out that appellant told his mother to call the police because he was "ready to face it," flagged down the detectives, and told them he killed his brother. The prosecutor, however, cited the coroner's testimony that death occurred around 4:00 a.m. on January 3, and the evidence that appellant called Payne shortly thereafter, at 6:00 a.m. The court agreed to give the instruction, reasoning that it had "a sua sponte duty to instruct on flight whenever the prosecution relies on the evidence of flight to show consciousness of guilt."

The trial court instructed the jury pursuant to CALCRIM No. 372 as follows: "If the defendant fled immediately after the crime was committed, that conduct

may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

"'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt."' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) "The giving of such an instruction is statutorily required when flight evidence is relied upon by the prosecution." (*People v. Howard* (2008) 42 Cal.4th 1000, 1020 (*Howard*); § 1127c[2].)

Appellant contends that the trial court erred in giving the flight instruction because the prosecutor did not contend that appellant was trying to avoid arrest. However, the transcript cited by appellant indicates only that the prosecutor acknowledged that appellant eventually returned to the house after going to the barber with Payne. Nonetheless, the prosecutor argued that appellant's actions in going to Payne's house and asking to stay there constituted flight. The prosecution

---

[2]    Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. [¶] The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

13

therefore did rely on evidence of flight, requiring the trial court to give the instruction. (*Howard*, *supra*, 42 Cal.4th at p. 1020.)

Even if the court erred in giving the instruction, "we cannot reverse unless the error resulted in a miscarriage of justice. [Citation.] . . . [W]e must determine whether it is 'reasonably probable a verdict more favorable to defendant would have resulted had the instruction not been given.' [Citation.]" (*People v. Burns* (2011) 198 Cal.App.4th 726, 734.)

As discussed above, there is substantial evidence of appellant's guilt, other than his alleged flight. It is not reasonably probable a verdict more favorable to appellant would have resulted had the flight instruction not been given. Any alleged error therefore was harmless. (*People v. Zavala* (2005) 130 Cal.App.4th 758, 771.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.                    SUZUKAWA, J.

14